NOTICE

*The text of this opinion can be corrected before the opinion is published in the* <u>*Pacific Reporter*</u>. *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.gov*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

KEITH ROSCOE BARTMAN,

                Appellant,

        v.

STATE OF ALASKA,

                Appellee.

Court of Appeals No. A-13954
Trial Court No. 3KN-14-00947 CR

**O P I N I O N**

No. 2795 — January 10, 2025

Appeal from the Superior Court, Third Judicial District, Kenai, Jennifer K. Wells, Judge.

Appearances: Michael L. Barber, Barber Legal Services, Boston, Massachusetts, under contract with the Office of Public Advocacy, Anchorage, for the Appellant. Kayla H. Doyle, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for the Appellee.

Before: Allard, Chief Judge, and Wollenberg and Terrell, Judges.

Judge ALLARD.

Keith Roscoe Bartman was convicted, following a jury trial, of two counts of second-degree sexual abuse of a minor and one count of attempted second-degree

sexual abuse of a minor for engaging in sexual contact with a fourteen-year-old girl.[1] Bartman challenges his convictions, raising two issues on appeal. First, Bartman argues that the superior court violated his right to self-representation when it denied his request to represent himself. Second, Bartman argues that the superior court erred when it instructed the jury that the term "genitals" includes the mons pubis. For the reasons explained in this opinion, we reject both claims of error and affirm Bartman's convictions.

*Factual background*

Around January 2014, Bartman began dating Toni Bismark. Bismark had three children that were living with her: fourteen-year-old H.B.; nine-year-old C.B.; and six-year-old S.B. Bartman first moved in with Bismark and her children when they were living in a hotel in Anchorage. After a couple of months, the five of them moved down to Kenai and stayed with friends of Bartman.

In Kenai, the girls slept together on couches right by the entryway inside a house, while Bartman and Bismark slept inside of Bismark's car. On multiple occasions, Bartman came into the house at night while everyone was sleeping and sexually abused H.B.

H.B. testified that the first time it happened, Bartman began rubbing H.B.'s vagina over her pajamas, causing her to wake up. H.B. stated that she "froze up" and "couldn't do anything" other than lay there as Bartman continued to touch her.

According to H.B., after this first incident, Bartman would come into the house at night and sexually abuse H.B. at least once a week for over three months, from late February through May 2014. On some occasions, Bartman placed his hands underneath H.B.'s pajamas and touched her vagina; on others, he pulled her pajamas

---

[1] AS 11.41.436(a)(5)(A) and AS 11.41.436(a)(5)(A) & AS 11.31.100(a), respectively.

down and put his mouth on her vagina, or spread her legs apart and rubbed his penis against her. H.B. pretended to sleep while Bartman sexually abused her.

C.B. woke up on one of these nights and observed Bartman "grunting or moaning" as he rocked his pelvis against H.B.'s pajamas near her vagina. C.B. did not tell H.B. that she had seen anything until later that year because she was worried that her mother or H.B. would be mad about it.

H.B. testified that she intentionally began sleeping on the couch closest to the door to make sure Bartman would assault her and not her sisters. H.B. felt "scared," "angry," and "ashamed" whenever this happened because she knew it was wrong and she worried she would get in trouble if anyone found out.

Bartman, Bismark, and her children stayed with Bartman's friends for a few months, but would leave occasionally and stay with various people around the Kenai Peninsula. H.B. was hospitalized for some length of time between May and June of this period.[2] While H.B. was hospitalized, Bartman, Bismark, C.B., and S.B. stayed briefly at a hotel in Anchorage. While there, C.B. observed Bartman standing over S.B., pulling a blanket away from her and "messing with his pants." C.B. later testified that she was afraid Bartman was going to do to S.B. what he had done to H.B., so she kicked him in the chest and he left the room.

On a different occasion, the family was again staying with Bartman's friends. C.B. testified that a person she assumed to be Bartman came into the area where C.B. and S.B. were sleeping. C.B. heard a zipper open. C.B. testified that she "panicked" and kicked, and the person she assumed to be Bartman left.

While H.B. was in the hospital, Bartman and Bismark met a woman at a food bank named Valerie Campbell who offered to let them stay at her house. Bartman, Bismark, C.B., and S.B. moved in with Campbell, with H.B. moving in after she was

---

[2]    It is unclear from the record why H.B. was hospitalized. In its briefing, the State attributes her hospitalization to self-harm caused in part by Bartman's abuse.

released from the hospital. Just as they did with Bartman's friends, the three girls slept in Campbell's house while Bartman and Bismark slept in the car. Bismark eventually gave full custody of the girls to Campbell and the girls began staying with her by themselves. Under this arrangement, Bismark could pick up H.B. and spend time with H.B. away from Campbell's house.

In late June 2014, Campbell observed that H.B. was reluctant to leave when Bismark came to pick her up. Shortly thereafter, H.B. told Campbell about the sexual abuse and Campbell contacted the police. The police came to Campbell's house and interviewed the children and H.B. was also interviewed at a Child Advocacy Center. Campbell tried unsuccessfully to contact Bartman and Bismark to have them come to the residence.

When Bismark learned about the allegations against Bartman, she dropped him off on the side of the road between Nikiski and Soldotna and left him there. Bartman decided it was best for him to no longer be around Bismark and her children. Bartman subsequently wrote a suicide note and tried to kill himself by walking into the Kenai River. He was pulled out of the river by police and taken to a hospital to recover.

After he recovered, Bartman was interviewed by the police. The investigator told Bartman that he had interviewed the girls and that he knew what Bartman had done. Bartman denied knowing why the police were interviewing him, and described H.B. and her siblings as "beautiful little liars." Eventually, however, he stated that H.B. had "led [him] on" and that things got "out of hand."

Bartman acknowledged an instance where he put his hand inside H.B.'s jeans but insisted he only touched her waist and that H.B. initiated the encounter. Bartman initially claimed this was the only time he had done something like this to H.B. and denied having weekly sexual encounters with H.B. Later in the interview, the investigator asked Bartman about the incident where Bartman had walked into where the girls were sleeping and removed his pants. Bartman answered that he was simply changing his pants.

Bartman was asked about placing his mouth on H.B.'s genitals. He admitted that this was a second incident. He told the investigator that H.B. removed her pants and he kissed her from the "top of her pube line down." He claimed that he tried to pull away but his "face got buried in further."

Bartman was eventually charged with three counts of second-degree sexual abuse of a minor for his conduct involving H.B., two counts of attempted second-degree sexual abuse of a minor for his conduct involving C.B. and S.B., and one count of misdemeanor failure to register as a sex offender.[3]

At trial, the jury convicted Bartman of two counts of second-degree sexual abuse of a minor for his conduct involving H.B. As to the third charge involving H.B., the jury acquitted him of second-degree sexual abuse of a minor, but convicted him of the lesser-included offense of attempted second-degree sexual abuse of a minor. The jury acquitted Bartman of the two counts of attempted sexual abuse of a minor involving C.B. and S.B. The State dismissed the failure to register charge.

Bartman now appeals.

*Why we conclude that the superior court did not err when it denied Bartman's request to represent himself*

Bartman first argues that the superior court erred because it deprived him of his right to represent himself at trial. He argues that he knowingly, intelligently, and voluntarily waived his right to counsel and that he was at least minimally capable of presenting his case to the jury in a coherent fashion. We first describe the procedural history of this issue.

---

[3] AS 11.41.436(a)(5)(A), AS 11.41.436(a)(5)(A) & AS 11.31.100(a), and AS 11.56.840(a)(1), respectively. Bartman was required to register as a sex offender because he had previously pleaded guilty to attempting to sexually abuse a six-year-old child.

Prior to trial, Bartman underwent a competency evaluation because his appointed attorney expressed concerns regarding Bartman's competency to stand trial. The psychologist who evaluated Bartman found him competent to stand trial, but noted that Bartman "may, at times, be difficult to interact with." The psychologist noted that Bartman sometimes refused to participate in the evaluation, and that "[h]is response style was not elaborative, and he became much briefer in his answers when inquiries related to legal procedure were made." The superior court subsequently found Bartman competent to stand trial.

Nearly eleven months later, the court held a confidential representation hearing with just Bartman and his attorney. The hearing was held telephonically.

Bartman began by telling the court that he wished to represent himself at trial. The court's first question to Bartman was why he thought this would be in his best interest, to which Bartman answered that he was not aware he needed to give a reason. The court told Bartman it was not trying to trick him; he had the right to represent himself, but the court would have to first determine that he was minimally capable of doing so.

The court asked Bartman if he knew what he was charged with and what the possible penalties were. Bartman said "yes," but when the court asked for more specificity, Bartman did not answer. The court followed up by asking if Bartman had any legal training, and again received no audible response. When the court asked what it could do to make Bartman more comfortable answering the questions, Bartman provided no audible response. The court tried again to have Bartman answer its questions. Bartman was slow to respond and, when he did respond, he stated only that he did not feel that his attorney would represent him fully. He did not directly answer any of the court's questions.

The court then explained in detail why it was asking these questions. The court explained that trials are "complicated," and because Bartman would be going up against an experienced prosecutor, he would be at a disadvantage. Bartman responded

that despite having a tough time using the law library, he had been "doing [his] best to learn" and had learned he was able to represent himself even if he did not have a law license. Bartman acknowledged that he did not have any legal education or training.

After going through the list of charges, the court asked Bartman if he knew what level the offenses were. At this point, the defense attorney interjected, saying the level did not matter because Bartman faced a 99-year sentence. The court asked if Bartman understood, and he replied that he did.

The court again wanted to know what steps Bartman had taken to learn the rules of court and the rules of evidence. Bartman answered, "Aside from the questions, I wish to proceed without an attorney." After Bartman told the court that he did not want to answer any more questions, the court explained that it would be hard to make a decision concerning his right to represent himself if he was not willing to answer the court's questions. Bartman again said that he was not aware he "needed to give a finding in order to proceed without counsel."

The court replied that it understood and read a statement to Bartman that further explained the benefits of having an attorney, repeating the points from earlier while adding more details about the practical and strategic importance of having a lawyer. Upon finishing, the court asked Bartman if he had any questions, and he said "no."

The court indicated it had more questions it needed to ask, but received no response when it asked what formal education Bartman had. This caused the court to conclude that Bartman's unwillingness to answer prevented it from making the findings needed to grant Bartman's request:

> So I get the feeling you don't want to answer my questions, and that is fine, but to me that suggests that it's going to be hard to have a trial together. So that — and I'm not able to make the findings that I can make, so I'm really inclined at this point to say that, you know, I've done what I can to give you a chance to convince me that you're knowingly and intelligently waiving your right to a lawyer and that you can

– 7 –

present yourself in a rational and coherent manner. So unless there's anything else you want to say right now, I'm not going to allow you to represent yourself. Is there anything else you wanted to say?

Bartman did not provide an audible response. The court acknowledged it was difficult to gauge what was going on without being able to see Bartman and observe any visual cues. The defense attorney told the court that it was difficult for her as well since she could not see Bartman either. The attorney expressed that she wanted a chance to speak to him about this issue and, if he still wanted to pursue self-representation, she would speak with him about what information he would need to present to the court. The court agreed.

The court later conducted a second hearing in which the prosecutor and Bartman appeared in person, while Bartman's attorney appeared telephonically. The court noted that it had attempted "a pretty thorough inquiry" at the previous hearing but Bartman had been unwilling to answer many of its questions. Bartman was slightly more responsive than he had been at the first telephonic hearing, but the exchanges with the court continued to be marked by long pauses, unresponsive answers, and inaudible responses.

For example, the court asked Bartman if he had been able to look at the rules of evidence or the rules of criminal procedure. Bartman did not directly answer the question and instead told the court that he was trying to get funding for a private investigator. When the court asked Bartman about his level of education, Bartman remained silent for a period of time before telling the court about a dormmate in jail that was helping him. When the court warned Bartman that he might not be able to introduce all the evidence he sought to admit without the assistance of an attorney, Bartman did not respond at all.

Notably, when the court asked Bartman what penalties he thought he was facing, Bartman answered "30 [years] for all five [charges]." The court then corrected him, reminding him that he was facing a presumptive term of 99 years. The court also

warned Bartman that he would have to make decisions in the moment and would not always be able to consult with his dormmate. The court noted Bartman's reluctance to answer its questions and the time it often took Bartman to provide an answer. In response, Bartman was silent for a period of time and then said, "The bottom line is I'm bringing my truth to the table, and I don't feel that I have [to have] a representative in order to be at trial."

The court then asked the defense attorney and the prosecutor if they had anything to add. The defense attorney noted that Bartman had a constitutional right to represent himself. The prosecutor expressed significant concerns about Bartman's ability to represent himself, noting his confusion over the penalties he faced, his ongoing reluctance to answer the court's questions, and the non-responsive nature of the answers he did give.

The superior court agreed with the State and denied Bartman's motion to represent himself.

A criminal defendant has a constitutional right to waive their right to counsel and to represent themselves at trial if they "voluntarily and intelligently elect to do so."[4] This right of self-representation is not absolute; it may be restricted in narrow circumstances "to prevent a perversion of the judicial process."[5]

In *McCracken v. State*, the Alaska Supreme Court set forth the requirements that must be met before a trial court may permit a defendant to represent themselves.[6] First, the trial court must determine whether a defendant "is capable of

---

[4] *Falcone v. State*, 227 P.3d 469, 472 (Alaska App. 2010) (quoting *Faretta v. California*, 422 U.S. 806, 807 (1975)).

[5] *Id.* (quoting *McCracken v. State*, 518 P.2d 85, 91 (Alaska 1974)).

[6] *McCracken*, 518 P.2d at 91-92.

presenting his allegations in a rational and coherent manner."[7] Second, the trial court must be satisfied that the defendant "understands precisely what he is giving up by declining the assistance of counsel."[8] Lastly, the trial court must determine that the defendant "is willing to conduct himself with at least a modicum of courtroom decorum."[9]

Thus, once a defendant clearly and unequivocally declares their desire to waive counsel, the trial court must conduct a self-representation hearing in which the court details the benefits of counsel and the risks of proceeding *pro se*.[10] "The purpose of this hearing is to ensure that the defendant's decision to waive their constitutionally protected right to counsel is a knowing and intelligent one."[11] The hearing also ensures that the defendant is "'minimally capable of presenting their case in a coherent fashion' and 'capable of conducting their defense without being unusually disruptive.'"[12]

The State does not contest that Bartman clearly and unequivocally asserted his right to self-representation, and the State does not argue that Bartman would be unusually disruptive if he represented himself. Rather, the State argues that, because Bartman was deflective or otherwise nonresponsive to the court's questions, the court was unable to find that Bartman could present his defense in a coherent manner or that he understood the advantages of proceeding with an attorney and the disadvantages of proceeding without one.

---

[7]   *Id.* at 91.

[8]   *Id.*

[9]   *Id.* at 92.

[10]   *Hinshaw v. State*, 515 P.3d 129, 138 (Alaska App. 2022) (citing *McCracken*, 518 P.2d at 91-92).

[11]   *Id.*

[12]   *Id.* (quoting *Oviuk v. State*, 180 P.3d 388, 390 (Alaska App. 2008)).

In *Bourdon v. State*, an unpublished case, Bourdon asserted his right to self-representation.[13] The trial court asked Bourdon whether he could follow the rules of evidence and whether he understood how to present evidence.[14] Bourdon refused to respond, stating that he "will not understand anything that [the court is] saying right now" and he objected to the court's exercise of jurisdiction over him.[15] The court told Bourdon that it needed to ask him questions from a self-representation checklist and that without "comprehensible answers," the court would not be able to grant his request.[16] Bourdon refused to answer the questions and continued to contest the court's jurisdiction over him.[17] The court denied Bourdon's request to represent himself because his "refusal to answer the judge's questions effectively sabotaged the judge's ability to determine whether Bourdon knowingly, intelligently, and voluntarily waived his right to counsel."[18]

This Court determined that the trial court did not abuse its discretion in denying the defendant's request for self-representation because Bourdon had caused the trial court to suspect "that he might not be able to understand the legal issues in the case, to organize himself and mount a coherent defense, and to conform himself to proper courtroom decorum in the sense of following the court's orders not to argue legal irrelevancies to the jury."[19] However, "the judge was never able to get to the bottom of

---

[13] *Bourdon v. State*, 2018 WL 3933557, at *1-2 (Alaska App. Aug. 15, 2018) (unpublished).

[14] *Id.*

[15] *Id.* at *2.

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.* at *3.

these potential concerns" because Bourdon either deflected in response to the judge's questions with irrelevant responses or denied the court's authority to conduct the inquiry at all.[20]

Bartman's responses to the court's questions are not as obstinate as Bourdon's responses. In fact, at the in-person hearing, the court commended Bartman for "clearly paying attention" and providing his "full attention and trying to be as responsive as [he could]." However, we find *Bourdon* sufficiently analogous because, both in *Bourdon* and in the present case, the defendants' non-responsiveness and deflection in the face of trial court questioning prevented the trial court from determining that the defendant was minimally capable of representing himself.

Bartman declined to answer many of the court's questions. Rather than answer the court's question at the first hearing about what steps he had taken to learn the rules of court and rules of evidence, Bartman stated he did not want to answer any more questions and wished to proceed *pro se*. Though the court told him it would be difficult to decide whether Bartman was capable of representing himself if he did not answer its questions, Bartman responded that he was not aware he "needed to give a finding." When he was again asked at the second hearing whether he had the opportunity to review the rules of evidence or criminal procedure, Bartman deflected and told the court he was gathering funds for a private investigator.

Though Bartman's and Bourdon's attitudes toward their respective trial courts stand in stark contrast, Bartman's pattern of non-responsiveness and deflection resulted in the same outcome. The superior court was unable to determine whether Bartman understood the advantages of proceeding with an attorney and the disadvantages of proceeding without one, and whether he would be able to present his

---

[20] *Id.*

arguments in a minimally coherent manner. We therefore conclude that the superior court did not err when it denied Bartman's request to represent himself.[21]

### *Why we conclude that the superior court did not err when it provided a definition of "genitals" that included the mons pubis*

Next, Bartman argues that the superior court erred when it provided, in response to a jury question, a definition of the term "genitals" that included the mons pubis — the rounded mass of fatty tissue that covers the pubic bone.

Bartman was charged with multiple counts of second-degree sexual abuse of a minor for "engag[ing] in sexual contact" with H.B.[22] The phrase "sexual contact" is defined by statute as "the defendant's knowingly touching, directly or through clothing, the victim's genitals, anus, or female breast."[23]

At trial, the State presented evidence of Bartman's inculpatory statements to the police, including his admission that he had kissed H.B. from the "pube line down." In closing argument, the prosecutor told the jury that Bartman was guilty of touching H.B.'s "genitals" even if he did not penetrate or touch "just the vagina itself." Rather, the prosecutor argued, Bartman was guilty of engaging in sexual contact even

---

[21] In their briefing on appeal, the parties use an abuse of discretion standard of review. *See, e.g.*, *Falcone v. State*, 227 P.3d 469, 473 (Alaska App. 2010) (reviewing for abuse of discretion the trial court's determination that the defendant was incapable of presenting his case in a coherent fashion or conforming to the orderly procedures of the court). However, as we have recently noted, federal law generally views the waiver determination as a mixed question of fact and law that is reviewed *de novo*. *See Hinshaw v. State*, 515 P.3d 129, 137 (Alaska App. 2022) (discussing federal standard of review). Because we conclude that the outcome in this case would be the same regardless of what standard of review we employ, we need not address it further.

[22] AS 11.41.436(a)(5)(A).

[23] AS 11.81.900(b)(61)(A)(i).

if he only touched the mons pubis. Here is how the prosecutor articulated this point to the jury:

> Sometimes there are questions and we talk about the vagina, those things, that's a part of the female genital structure, [b]ut [the term "genitals"] includes all of it . . . all of the female genitalia, from, as Mr. Bartman explained it, the pube line on down — the mons pubis, the pubic hair, that area of her genitals, that whole structure. It doesn't require actual penetration or touching of just the vagina itself.

Although the prosecutor's argument was a legal one — *i.e.*, an argument about the meaning of the statutory term "genitals" — the jury was not given a definition of the term "genitals" as part of their jury instructions. Instead, the jury was simply instructed, consistent with the statutory definition, that sexual contact means "the defendant's knowingly touching, directly or through clothing, the victim's genitals, anus, or female breast."

During deliberations, the jury sent the superior court a note: "Could we get some clarification on the State's definition of a victim's genitals. Does the State have a set definition of specific body parts? In relation to the definition of victim's genitals."

After consulting with the parties, reviewing our case law, and examining various dictionaries, the court provided the following instruction to the jury:

> The term 'genitals' means the entire female genitalia, including both the vagina and the vulva. Vulva is defined as the external parts of the female genitalia, including the labia majora, the labia minora, mons pubis, clitoris, perineum, and the vestibule or entrance to the vagina.

Bartman objected to this instruction, and he again challenges this instruction on appeal. Bartman argues first that the court should not have provided *any* definition to the jury. This is incorrect. Alaska Criminal Rule 30(b) provides that "[t]he court shall instruct the jury on all matters of law which it considers necessary for the

jury's information in giving their verdict."[24] If the jury appears confused about a legal issue and previous instructions do not alleviate that confusion, "the trial judge has a 'responsibility to give the jury the required guidance by a lucid statement of the relevant legal criteria. When a jury makes explicit its difficulties, a trial judge should clear them away with concrete accuracy.'"[25] Further, when a statutory term "is susceptible of differing interpretations, only one of which is a proper statement of the law, an instruction must be given."[26]

Here, the jury was apparently confused about a legal issue — namely, the meaning of the term "genitals." The judge therefore had an obligation to clear away the jury's confusion about the meaning of this term "with concrete accuracy."[27]

Bartman's second argument is that the definition the court provided was legally incorrect because the term "genitals," at least for purposes of the statutory definition of "sexual contact," does not include the mons pubis.

The proper interpretation of a criminal statute is a question of law that we decide *de novo* using our independent judgment.[28] "When we interpret a statute, our task is 'to ascertain the legislature's intent and then to construe the statute so as to implement that intent.'"[29] We interpret statutes "according to reason, practicality, and

---

[24] Alaska R. Crim. P. 30(b).

[25] *Des Jardins v. State*, 551 P.2d 181, 190 (Alaska 1976) (quoting *Bollenbach v. United States*, 326 U.S. 607, 612-13 (1946)).

[26] *McKee v. State*, 488 P.2d 1039, 1043 (Alaska 1971) (citing *People v. Escarcega*, 78 Cal. Rptr. 785, 789 (Cal. App. 1969)).

[27] *Des Jardins*, 551 P.2d at 190 (quoting *Bollenbach*, 326 U.S. at 612-13).

[28] *Seaman v. State*, 499 P.3d 1028, 1034 (Alaska App. 2021) (citing *Callan v. State*, 904 P.2d 856, 857 (Alaska App. 1995)).

[29] *R.C. v. State*, 435 P.3d 1022, 1026-27 (Alaska App. 2018) (quoting *Williams v. State*, 2015 WL 4599554, at *3 (Alaska App. July 29, 2015) (unpublished)).

common sense, considering the meaning of the statute's language, its legislative history, and its purpose."[30] Alaska courts use "a sliding scale approach to statutory interpretation, in which 'the plainer the statutory language is, the more convincing the evidence of contrary legislative purpose or intent must be.'"[31]

This Court has not previously defined the term "genitals" as it is used in the definition of "sexual contact." We have, however, defined the term "genital opening" (a term used in the statutory definition of "sexual penetration"[32]) to encompass the vulva.[33] In *Hooper v. State*, an unpublished case, we relied on Webster's New World Dictionary to define the vulva as "the external genital organs of the female, including the labia majora, labia minora, clitoris, and the entrance to the vagina."[34]

Like the term "genital opening," the term "genitals" also encompasses the vulva — *i.e.*, the external female genital organs. The definition of vulva we used in *Hooper*, however, did not list the mons pubis as one of the external female genital organs.[35] Bartman, relying on this omission, argues that *Hooper* "excluded the mons pubis from its definition [of genitals]."

---

[30] *Alaska Airlines, Inc. v. Darrow*, 403 P.3d 1116, 1121 (Alaska 2017) (citing *Louie v. BP Expl. (Alaska), Inc.*, 327 P.3d 204, 206 (Alaska 2014)).

[31] *Adamson v. Municipality of Anchorage*, 333 P.3d 5, 11 (Alaska 2014) (quoting *McDonnell v. State Farm Mut. Auto. Ins. Co.*, 299 P.3d 715, 721 (Alaska 2013)).

[32] AS 11.81.900(b)(62)(A).

[33] *Hooper v. State*, 1989 WL 1595096, at *3 (Alaska App. July 19, 1989) (unpublished).

[34] *Id.*; *see also Littlefield v. State*, 2008 WL 4822916, at *3 (Alaska App. Nov. 5, 2008) (unpublished) (holding that "sexual penetration" includes an intrusion into the labia majora); *Mason v. State*, 2004 WL 1418694, at *2 (Alaska App. June 23, 2004) (unpublished) (holding that "clitoral touching" constitutes "sexual penetration").

[35] *See Hooper*, 1989 WL 1595096, at *3.

But there is a difference between "excluding" a term and "not including" a term. The Webster's New World Dictionary we relied on in *Hooper* is a common usage dictionary intended for a lay audience, and its definition of vulva did not purport to be an exhaustive description of the external female genital organs. It did not, in other words, *exclude* the mons pubis; it simply did not affirmatively *include* it.[36]

As the State discusses in its brief, medical texts and dictionaries provide more detailed descriptions of the vulva, and the consensus among these authorities is that the mons pubis is part of the vulva. One text, for example, writes that the "female external genitalia" includes the following parts: "the mons pubis, labia majora et minora pudendi, the clitoris, vestibule, vestibular bulb and the greater vestibular glands."[37]

Bartman argues that we should not rely on medical texts and dictionaries to define the statutory term "genitals." Rather, he argues that we are "required" to rely only on the "common usage" of the term as determined by lay dictionaries, like the one we relied on in *Hooper*. This is incorrect. Alaska Statute 01.10.040(a) states that "[w]ords and phrases shall be construed according to the rules of grammar and

---

[36] We note, however, that the omission of the mons pubis from the definition of vulva used in *Hooper* makes particular sense when it is understood that *Hooper* was defining the term "genital opening," and not "genitals." *See id*. There is an important distinction between "genital opening" and "genitals" in that the touching of the mons pubis, although sufficient to establish that the defendant engaged in sexual contact (because the mons pubis is part of the female genitals), is not sufficient to establish that the defendant engaged in sexual penetration (*i.e.*, "an intrusion, however slight, . . . into the genital or anal *opening* of another person's body"). AS 11.81.900(b)(62)(A) (emphasis added).

[37] *Gray's Anatomy* 1446 (Peter L. Williams et al. eds., 37th ed. 1989); *see also* Richard Sloane, *The Sloane-Dorland Annotated Medical-Legal Dictionary* (1987) (defining "vulva" as "the external genital organs of the female" that includes "the labia majora, labia minora, [and] mons pubis"); *Dorland's Illustrated Medical Dictionary* (28th ed. 1994) (defining the "external female genital organs" to include the pudendum femininum, and, in turn, defining the "pudendum femininum" to include the mons pubis); *Stedman's Medical Dictionary* (28th ed. 2006) (defining "vulva" as "the external genitalia of the female, composed of the mons pubis" among others).

according to their common and approved usage."[38] But the very next sentence of that provision explains that this rule does not apply to words that have acquired a particular and technical meaning: "Technical words and phrases and those that have acquired a peculiar and appropriate meaning, whether by legislative definition or otherwise, shall be construed according to the peculiar and appropriate meaning."[39]

The statutory term "genitals" has both a common meaning and a technical one. But as our discussion above has made clear, these definitions are not mutually exclusive or contradictory. Rather, the technical definition supplements and provides further detail to the more general description of "genitals" (and associated terms, like "vulva") typically provided by lay dictionaries.

In *Hooper*, the question presented — whether the phrase "genital opening" for purposes of sexual penetration was ambiguous — could be resolved solely by looking at the general definition of "vulva" provided in a lay dictionary, together with the definition of "genital."[40] Reading these definitions together, we concluded that the phrase "genital opening" included the external genitalia and thus, there was no ambiguity in the court's failure to further define this phrase for the jury.[41] In other words, the issue in *Hooper* was *not* whether the vulva included the mons pubis specifically, but whether "the phrase genital opening includes the external genitalia under Alaska law."[42]

---

[38] AS 01.10.040(a); *see also Walker v. State*, 742 P.2d 790, 791 (Alaska App. 1987).

[39] AS 01.10.040(a); *see also Gerlach v. State*, 699 P.2d 358, 360 n.3 (Alaska App. 1985).

[40] *See Hooper*, 1989 WL 1595096, at *3.

[41] *Id.*

[42] *Id.*

The issue in this case is distinct from *Hooper*. Here, we must evaluate the specific definition of "vulva." As we have explained, the lay definition of "vulva" we relied on in *Hooper* does not address whether the mons pubis is part of the genitals. Medical texts, however, are clear on this point.

Our reliance on medical texts is further supported by the decisions of other state courts, including Virginia, Idaho, North Carolina, Texas, and Iowa, all of which have relied, at least in part, on medical texts to conclude that the mons pubis is part of the "genitals" or "genital area."[43]

Our reliance on medical texts is also supported by the legislative history and purpose of the statute. This Court has identified the "central purpose" of AS 11.41.436 as protecting children "from becoming the objects of adults' sexual gratification."[44] The inclusion of the mons pubis within the definition of "genitals" better supports the statute's purpose of protecting children from adult sexual predation.

For all these reasons, we hold that the mons pubis is part of the female "genitals" as that term is used in the statutory definition of "sexual contact."

Finally, Bartman makes one more challenge to the jury instruction. As we have explained above, the jury's question was as follows: "Could we get some clarification on the *State's* definition of a victim's genitals. Does the *State* have a set definition of specific body parts? In relation to the definition of victim's genitals." (Emphasis added). Bartman asserts that this wording indicates that the jury wanted the court to clarify the State's interpretation of the term "genitals," and he argues that the court's response "should have provided some clarification that the definition it

---

[43] *Horton v. Commonwealth*, 499 S.E.2d 258, 261 (Va. 1998); *Crawford v. State*, 377 P.3d 400, 409 n.4 (Idaho 2016); *State v. Weathers*, 366 S.E.2d 471, 473 (N.C. 1988) (citing *State v. Ludlum*, 281 S.E.2d 159, 162 (N.C. 1981)); *Carmell v. State*, 963 S.W.2d 833, 837 (Tex. App. 1990), *rev'd on other grounds*, 529 U.S. 513 (2000); *State v. Martens*, 569 N.W.2d 482, 485-86 (Iowa 1997).

[44] *Stephan v. State*, 810 P.2d 564, 567 (Alaska App. 1991).

ultimately provided was the court's view of the law or the legal definition of 'genitals' and not the 'State's definition.'"

We find no merit to this argument. For starters, the jury was instructed that they should disregard the lawyers' arguments if they departed from the law as instructed by the court. Further, the court did not immediately respond with an answer to the jury's question. Instead, the court explained that it would need additional time to research and answer the question. Specifically, the court told the jury:

> The court is not able to research and answer this question before 4:30PM today and needs more time. Please deliberate until 4:30PM and return to the court at 8:30AM tomorrow morning. This is the court's decision. Do not hold it against either party.

Given this response, it is highly unlikely the jury believed the definitions of "genitals" and "vulva" provided by the court were the State's definitions, or that the court was otherwise advocating on behalf of the State.

*Conclusion*

For the reasons stated above, the judgment of the superior court is AFFIRMED.