**Bruce CROSS, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–3073.**

Court of Appeals of Alaska.

June 21, 1991.

■■■■■■■

---

Leslie A. Hiebert, Asst. Public Advocate, and Brant McGee, Public Advocate, Anchorage, for appellant.

Nancy R. Simel, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Douglas B. Baily, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., COATS, J., and ANDREWS, Superior Court Judge.*

## OPINION

COATS, Judge.

Bruce Cross was convicted, following a jury trial, of burglary in the first degree and theft in the fourth degree. AS 11.46.-300(a)(1) and AS 11.46.150. He appeals to this court arguing that his convictions are invalid because the state obtained the conviction in violation of the double jeopardy clauses of the United States and Alaska Constitutions. We agree and reverse his convictions.

On February 13, 1988, Cross visited his girlfriend, Jacqueline Ford. Ford was staying in the apartment of a friend, Lori Slover. Candice Hultman lived in an apartment across the hall from Slover. On February 13, Hultman had been away from her home all afternoon and discovered, upon her return, that her video cassette recorder (VCR) was missing. The police later discovered that Cross and Slover had pawned the VCR at Spenard Pawn Shop that afternoon.

* Sitting by assignment made pursuant to article    IV, section 16 of the Alaska Constitution.

Cross testified that when Ford was in the shower, Slover asked him to help her retrieve her VCR which was in a neighbor's apartment. Cross maintained that the door to Hultman's apartment was unlocked, and he believed that the VCR belonged to Slover. He also testified that he accompanied Slover to the pawn shop and produced identification because Slover did not have any of her own.

Defense counsel, an assistant public defender, stated before trial that she planned to call Ford as a witness on Cross' behalf. Just before opening statements, the prosecutor informed the court that Ford had recently been charged with a felony, and the Public Defender Agency had been appointed to represent her. The state expressed concern about a conflict of interest if the Public Defender Agency simultaneously represented both Ford and the defendant. Trial began that morning with opening statements. The state presented several witnesses.

Later in the afternoon, the assistant public defender representing Cross stated that she had discovered that the Public Defender Agency had not only been appointed to represent Ford on the pending felony, but had also represented her in the recent past. She informed the court that no one at the Public Defender Agency had yet discussed the new case with Ford, and that the Office of Public Advocacy ("OPA") could be appointed to represent her. The assistant public defender also stated that she had informed Ford that she could discuss her testimony on Cross' case with an attorney from OPA. Counsel stated that she did not believe that an actual conflict existed, and she did not feel that it was necessary for her to withdraw from representing Cross.

Superior Court Judge Karl S. Johnstone stated that, if a conflict did exist, he could not issue an order removing the Public Defender Agency from Ford's pending case because that case was not before him. Instead, Judge Johnstone advised Cross of the potential conflicts that could arise from the dual representation. Cross responded that he believed Ford's testimony would help him.

The court then indicated two ways it might proceed: allow Ford to testify, and, if an actual conflict arose, declare a mistrial and appoint new counsel for Cross; or, grant a mistrial based on the existing conflict before the trial proceeded any further. To determine the gravity of the conflict, the court inquired about Ford's testimony. Defense counsel requested an *ex parte* hearing. The court agreed but suggested a recess first for the attorneys to consult with their offices.

After the recess, the prosecutor stated that his office believed the conflict was unavoidable because Ford had an extensive history of theft offenses, and she was present during the present offense for which Cross was on trial. The state expressed concern that, if convicted, Cross would bring an ineffective assistance claim on the grounds that the agency failed to point out Ford as a potential suspect. The state then suggested that the court appoint OPA either to represent Cross, or to meet with Cross and his attorney to determine whether an actual conflict existed. Defense counsel suggested that the court appoint OPA to advise Ford on her testimony. Counsel maintained that an irreconcilable conflict did not currently exist, and stated that she had not learned anything relevant to Ford's proposed testimony from privileged conversations with Ford.

The court expressed concern that the evidence which Cross presented at trial might implicate Ford in the offense. The court questioned what investigation had been conducted by the Public Defender Agency concerning Ford's participation in the offense. Defense counsel again requested an *ex parte* hearing to explain the results of her investigation, and the nature of Ford's testimony. The court concluded that a hearing would not be useful, reasoning that the hearing would not reveal the nature of the state's cross-examination.

The court found that an irreconcilable conflict of interest existed which required the Public Defender Agency to withdraw from representing Cross. Judge Johnstone declared a mistrial and appointed OPA to represent Cross.

Before Cross' second trial commenced, his new attorney moved to dismiss the charges based on double jeopardy. Cross claimed that there was no manifest necessity for declaring a mistrial during his original trial. Superior Court Judge Peter A. Michalski denied Cross' motion. Judge Michalski found that the Public Defender Agency had an irreconcilable conflict at the time of the first trial, and Judge Johnstone was therefore justified in declaring a mistrial. A jury convicted Cross on both counts. This appeal followed.

Cross argues that his second trial was barred by the double jeopardy provisions of the United States and Alaska Constitutions. U.S. Const. amend. V; Alaska Const. art. I, § 9. He claims that manifest necessity did not exist to justify a mistrial because there was no conflict of interest or, alternatively, any conflict that did exist could have been cured without granting a mistrial. The state claims that manifest necessity did exist, and therefore a new trial did not violate double jeopardy. The state argues that the conflict was serious and unavoidable.

■ Jeopardy attaches when the jury is sworn. At that time, the defendant gains a "valued right to have his trial completed by a particular tribunal." *Wade v. Hunter*, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949). Once jeopardy attaches, the defendant may not be retried on the same offense unless he consented to the mistrial or there was manifest necessity. *Arizona v. Washington*, 434 U.S. 497, 505, 98 S.Ct. 824, 830, 54 L.Ed.2d 717 (1978); *Browning v. State*, 707 P.2d 266, 268 (Alaska App.1985) (*quoting Koehler v. State*, 519 P.2d 442, 448 (Alaska 1974)). There is no question that the mistrial in this case was declared without Cross' consent.

■ The manifest necessity standard was first articulated by the United States Supreme Court in 1824. The Court stated that the trial court may, within its discretion, find manifest necessity and grant a mistrial but "the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvi-

ous causes." *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824). This court has similarly emphasized caution; a mistrial without defense consent should only be declared in "very extraordinary and striking circumstances." *Browning*, 707 P.2d at 268 (*quoting Lewis v. State*, 452 P.2d 892, 896 (Alaska 1969)). *See also Downum v. United States*, 372 U.S. 734, 736, 83 S.Ct. 1033, 1034, 10 L.Ed.2d 100 (1963). The manifest necessity standard requires a high degree of necessity such that "the ends of public justice would not be served by a continuation of the proceedings." *United States v. Jorn*, 400 U.S. 470, 485, 91 S.Ct. 547, 557, 27 L.Ed.2d 543 (1971).

■ Even when a high degree of necessity exists which would ordinarily justify a mistrial, the trial judge must make further inquiry to determine if an alternative measure—less drastic than a mistrial—would alleviate the problem. If further inquiry could have been made, or alternatives taken to cure the prejudice, the trial court will have abused its discretion in finding manifest necessity. *See Whiteaker v. State*, 808 P.2d 270 (Alaska App.1991) (trial court failed to explore all possible alternatives to a mistrial); *Browning*, 707 P.2d at 269–70 (prejudice could have been cured by jury instruction); *Koehler*, 519 P.2d at 449 (no manifest necessity because court failed to inquire whether there was any possibility of reaching verdict). *See also Jorn*, 400 U.S. at 487, 91 S.Ct. at 558 (mistrial not warranted because alternatives, such as granting continuance or allowing witnesses to waive fifth amendment privilege, were available); *Douglas v. United States*, 488 A.2d 121 (D.C.App.1985) (mistrial not justified because defendant was willing to waive conflict-free counsel).

■ In addition to being involved in the middle of a jury trial, Cross had also formed an attorney-client relationship with his public defender. From the record it appears that this public defender was Cross' attorney of choice, and Cross was

willing to waive any potential conflicts.[1]

In *Wheat v. United States,* 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988), the Supreme Court reviewed a decision in which the federal district court judge refused to allow the defendant to substitute his current counsel for counsel of his choice. The hearing on the defendant's motion for substitution took place one day before the defendant's scheduled trial. *Id.* 108 S.Ct. at 1695. The government objected to the substitution of counsel. The government pointed out that it had charged the defendant, Wheat, with participating in a conspiracy to distribute drugs. The attorney whose representation Wheat sought, Eugene Iredale, also represented two other defendants who were charged in the same conspiracy. In discussing the problems of having a single attorney represent codefendants, the Supreme Court stated:

> In previous cases, we have recognized that multiple representation of criminal defendants engenders special dangers of which a court must be aware. While "permitting a single attorney to represent codefendants ... is not *per se* violative of constitutional guarantees of effective counsel," a court confronted with and alerted to possible conflicts of interest must take adequate steps to ascertain whether the conflict warrants separate counsel. As we said in *Holloway,* [*v. Arkansas,* 435 U.S. 475, 482, 98 S.Ct. 1173, 1178, 55 L.Ed.2d 426 (1978)],
>
> > Joint representation of conflicting interests is suspect because of what it tends to prevent the attorney from doing.... [A] conflict may ... prevent an attorney from challenging the admission of evidence prejudicial to one client but perhaps favorable to another, or from arguing at the sentencing hearing the relative involvement and culpability of his clients in order to

minimize the culpability of one by emphasizing that of another.

*Id.* 108 S.Ct. at 1697 (citations omitted).

The *Wheat* majority recognized the importance of the defendant's sixth amendment right to counsel of his choice. It also recognized that a defendant could to some extent waive the conflict of interest. However, the *Wheat* majority concluded that:

> [W]here a court justifiably finds an actual conflict of interest, there can be no doubt that it may decline a proffer of waiver, and insist that defendants be separately represented.

*Id.* 108 S.Ct. at 1698. The Court went on to uphold the trial court judge's refusal to allow the substitution of counsel. *Id.* 108 S.Ct. at 1699–1700.

We find that the instant case is distinguishable from *Wheat,* and leads to a different result. As a starting point, we note that *Wheat* was a five to four decision with a strong dissent which emphasized the defendant's right to counsel of his choice. It appears that the decision turned on the facts of that particular case, and the case would have had a different outcome if the facts were stronger for the defendant. Second, *Wheat* was a case where the defendant wanted to engage new counsel; it did not involve interfering with an ongoing attorney-client relationship. Third, *Wheat* did not involve interfering with that attorney-client relationship toward the end of a trial. Fourth, *Wheat* did not involve declaring a mistrial. Cross had an important double jeopardy right to complete his trial in front of his first jury. He was deprived of this opportunity. Fifth, the conflict of interest in *Wheat* arose out of the attorney representing two codefendants whose charges were based on the same drug conspiracy. The conflict arose from representing both codefendants at the same time. Here, the potential conflict arose from the

---

1. Judge Johnstone's inquiries of Cross were not sufficient to establish that Cross was fully aware of all of the possible conflicts of interest which his attorney might have or which might develop, or that Cross fully understood the ramifications of those possible conflicts. We agree with the state that Cross' purported waiver was inadequate. However, we believe that the trial court could have more fully explored the potential conflicts, and could have attempted to see if Cross was willing to waive the conflicts. We believe the court was required to take these steps because of the importance of Cross' rights to complete his trial in front of this jury with counsel of his choice.

fact that another assistant public defender (apparently not Cross' counsel) had previously represented a witness, Ford, in connection with an unrelated matter. Although there was certainly a potential for conflict based on the Public Defender Agency's past representation of Ford, it is not obvious that the potential conflict was an actual one. Moreover, to the extent that any actual conflict arose from the agency's past representation of Ford, it is not apparent that the conflict could not have been resolved by precluding the agency from representing Ford as a witness in Cross' case.[2]

While Ford may also have been a potential defendant with respect to the incident giving rise to the charges against Cross, that conflict was clearly potential rather than actual. If and when it became actual, the conflict may well have precluded the agency from all further representation of Ford. The possibility of disrupting Ford's future representation by the agency, however, certainly did not make it manifestly necessary to declare a mistrial in Cross' case. Nor did manifest necessity arise from the mere possibility that Cross might, at some later point, claim ineffective assistance of counsel. As we have already indicated, this concern could in large measure have been addressed by a thorough, on-record inquiry to assure that Cross fully understood his situation and was nonetheless willing to proceed. In any event, the possibility that Cross might claim error on appeal does not equate to manifest necessity; if a mistrial could be declared against the wishes of the accused every time potential error occurred, the constitutional protection against double jeopardy would become virtually meaningless. The attorney from the Public Defender Agency who was representing Cross offered to explain to the court, *ex parte*, the reason why she felt that there would be no conflict. On the record before us, it appears quite possible that there would be no conflict, or

that the conflict, if it existed, would be one that could be waived. Judge Johnstone failed to adequately explore the existence of the conflict, or remedies short of a mistrial.

Cross had important constitutional rights to complete his trial with the jury which had been impaneled, and with the counsel who had been appointed to represent him. We believe that before the trial court could interfere with these rights, the court was required to show that competing considerations of similar magnitude justified declaring a mistrial. The record in this case simply does not show this.

We accordingly hold that Cross' convictions are reversed.

MANNHEIMER, J., not participating.

---

**2.** Judge Johnstone concluded that there was a solution to the potential conflict that the PDA had recently been appointed to represent the witness in another unrelated matter; the witness could obtain different representation. No

one appears to have foreseen any problem with this arrangement. The problem upon which Judge Johnstone and the state focused in the trial court was the fact that the PDA had previously represented Ford.