NOTICE

*The text of this opinion can be corrected before the opinion is published in the* *Pacific Reporter*. *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.gov*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

TALLON COLT WESTLAKE,

Petitioner,

v.

STATE OF ALASKA,

Respondent.

Court of Appeals No. A-14462
Trial Court No. 3AN-22-06282 CR

O P I N I O N

No. 2828 — April 17, 2026

Petition for Review from the Superior Court, Third Judicial District, Anchorage, Michael L. Wolverton, Judge.

Appearances: Jenna C. Klein, Assistant Public Defender, and Terrence Haas, Public Defender, Anchorage, for the Petitioner. Nancy R. Simel, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for the Respondent.

Before: Wollenberg, Harbison, and Terrell, Judges.

Judge TERRELL.

Under the Double Jeopardy Clauses of the United States and Alaska Constitutions,[1] a defendant cannot be retried for the same offense following a mistrial

---

[1]  U.S. Const. amend. V; Alaska Const. art. I, § 9.

absent their consent to the mistrial or "manifest necessity" for the mistrial.[2] The prohibition on multiple trials for the same offense without the defendant's consent or manifest necessity is "deeply ingrained" in our legal system, serving as a valuable check against government overreach.[3]

But like many of our constitutional protections against government overreach, it is not without cost. Enforcing the prohibition against multiple trials means there will be instances where "the State will be barred from retrying the defendant, regardless of the strength of the State's evidence."[4]

Here, Tallon Colt Westlake was tried on four theories of homicide and one count of tampering with physical evidence for allegedly beating his father to death and then cleaning up the scene. The jury began deliberations on a Thursday afternoon and continued into Friday before advising the trial court first thing Monday morning that it had reached a verdict on the highest charge but had not reached a unanimous verdict on the next highest charge. Upon further inquiry by the court, the jury said that it had been unable to reach a decision on any of the remaining counts but also asked for clarification regarding one of the counts.

The jury ultimately returned a verdict of not guilty on the most serious charge, first-degree murder. Before the jury returned this verdict, however, the court engaged in an exchange with the jury foreperson in open court which indicated that there was juror confusion about several legal issues. Rather than inquiring about this apparent confusion or attempting to clarify it, the court determined, after polling the jury, that the jury was hung and dismissed the jury over Westlake's objection.

---

[2]  *Arizona v. Washington*, 434 U.S. 497, 505 (1978); *Koehler v. State*, 519 P.2d 442, 448 (Alaska 1974).

[3]  *Green v. United States*, 355 U.S. 184, 187-88 (1957).

[4]  *Allen v. State*, 366 P.3d 536, 541 (Alaska App. 2016).

Westlake moved to dismiss his case on double jeopardy grounds. Westlake argued that there was no manifest necessity for declaring a mistrial because the jury did not deliberate for a sufficient length of time, the jury should have received an instruction to continue deliberating with an eye toward reaching agreement if possible (a "*Fields* instruction"),[5] the jury's responses to the court's questions indicated that the jury was not actually hung, and the trial court failed to answer all of the jury's questions about the law. The court denied Westlake's motion to dismiss. Westlake then filed a petition for review in this Court. We granted review and ordered full briefing.[6]

Having closely reviewed the record, we agree with Westlake that the record does not show that there was manifest necessity to declare a mistrial. "Manifest necessity" is a high standard: a mistrial should be granted without the defendant's consent only in "very extraordinary and striking circumstances."[7] Here, the record indicates that the jury was confused about key legal concepts and that the court did not attempt to resolve the jury's legal confusion. The court also did not inquire if the jury would still be deadlocked even if this legal confusion were resolved. As a result, the record does not support the conclusion that the jury had no prospect of reaching a verdict or that there was no measure less drastic than a mistrial to break the deadlock.[8]

---

[5]   *Fields v. State*, 487 P.2d 831, 836-43 (Alaska 1971).

[6]   *See Tritt v. State*, 134 P.3d 364, 366 (Alaska App. 2006) (recognizing that we will accept petitions seeking review of a trial court's denial of a motion to dismiss criminal charges on double jeopardy grounds unless the "claim patently has no merit").

[7]   *Browning v. State*, 707 P.2d 266, 268 (Alaska App. 1985) (quoting *Lewis v. State*, 452 P.2d 892, 896 (Alaska 1969)).

[8]   *See Koehler v. State*, 519 P.2d 442, 449 (Alaska 1974) (recognizing that "the record must clearly support the trial court's implicit finding of 'no prospect of agreement'"); *Cross v. State*, 813 P.2d 691, 694 (Alaska App. 1991) ("Even when a high degree of necessity exists which would ordinarily justify a mistrial, the trial judge must make further inquiry to determine if an alternative measure — less drastic than a mistrial — would alleviate the problem.").

We therefore reverse the trial court's denial of Westlake's motion to dismiss.

*Facts and proceedings*

On August 20, 2022, at 6:51 a.m., Tallon Westlake called 911 to request an ambulance to his residence for his father, Dean Westlake.[9] Westlake stated that he was unsure if his father was alive and that his father was cold and stiff. Emergency responders arrived within minutes and declared Dean dead at the scene. Westlake told responders that he had last seen his father alive the night before. He made no other statements about what happened that night. The police arrested Westlake soon after.

An autopsy revealed that Dean was beaten to death. Dean also had two burn marks behind one of his ears, which were consistent with a lit cigarette being put out on him close to the time of his death.

There were no eyewitnesses to the killing. A neighbor heard a loud argument from Westlake's apartment at roughly 2:00 a.m. and noticed that Westlake's vehicle was parked outside the unit at that time. But the neighbor believed that the argument was between a man and a woman — not two men.

Subsequent investigation of Westlake's text messages showed that he was living in the downstairs unit in a residential duplex owned by his father's girlfriend, was behind on rent, had recently become unemployed, and was under some pressure from his father to move out so a paying tenant could move in. But the text messages were nonetheless very supportive, with discussions about Westlake staying in the unit, helping with maintenance, and finding more stability in his life. The prosecutor acknowledged in closing argument that the text messages between the two men indicated that Dean was a "very forgiving and very loving father" and showed "no animosity" between the two men.

_____

[9] We refer to Dean Westlake as "Dean" to differentiate him from the defendant.

Forensic examination of the scene indicated that the killing took place in the unit where Westlake lived. Upon arrival, officers observed that the floors had been recently cleaned with bleach and that a load of laundry (consisting of a pair of socks and a bleach-stained sweatshirt) had been started in the washing machine. A stain on one of the socks in the laundry later tested presumptively positive for blood that was identified as a DNA match for Dean. Investigators concluded that there were no signs of forced entry. They also observed that Westlake's hands appeared swollen (which defense counsel contested) and that there were bloodstains on his shoes and one of his socks. Later DNA testing of the stain on one of Westlake's shoes identified the blood as matching Dean. There was no other blood on Westlake's clothing or body.

Investigators collected many items from the scene. While some of the items that were suspected of having blood on them tested positive, others tested presumptively negative. The police did not test many of the other items — including two cigarette butts found next to Dean's body and nail clippings from Dean's hands. Westlake later argued at trial that testing any of these items could have revealed the DNA of the perpetrator.

Westlake was charged with his father's murder. A grand jury indicted Westlake on four counts: first-degree murder (Count I), second-degree murder (for knowingly engaging in conduct resulting in the death of another under circumstances manifesting extreme indifference to the value of human life) (Count II), manslaughter (Count III), and tampering with physical evidence (Count IV).[10] At trial, the jury was also instructed, at the State's request, on second-degree murder under the theory of causing the death of another while acting with intent to cause serious physical injury (Count I-A) as a lesser included offense of first-degree murder.[11]

---

[10]  AS 11.41.100(a)(1)(A), AS 11.41.110(a)(2), AS 11.41.120(a)(1), and AS 11.56.610(a)(1), respectively.

[11]  AS 11.41.110(a)(1).

The State's theory at trial was that Westlake "snapped" — due to his job loss, impending eviction, and substantial consumption of alcohol — and beat his father to death. The prosecution argued that this beating occurred in the four- to five-hour time window between when the neighbor heard the loud argument coming from Westlake's apartment and when Westlake called 911. Because there was no direct evidence of the identity of the perpetrator, the State relied solely upon circumstantial evidence to establish that Westlake was the person who beat his father to death.

The prosecutor argued that "this is not a manslaughter case" but rather "a murder one or a murder two case." The prosecutor suggested that second-degree murder under the theory of causing death while acting with the intent to cause serious physical injury was "actually the most appropriate crime based on the offense here." The prosecutor argued that Westlake's actions were "clearly the actions of somebody who intended to kill somebody. But the reality is that it's more certain that it's somebody who intended to seriously physically injure somebody."

Westlake's defense was that an unknown person committed the beating and attempted to clean up the scene afterwards. Westlake's attorney argued that the police failed to sufficiently investigate the killing or identify this person because they prematurely settled on Westlake as the perpetrator. In support of this defense, Westlake's attorney pointed to multiple pieces of physical evidence that were not forensically tested, including two cigarette butts likely left by the killer.

Westlake's level of intoxication, and its effect on his mental state, was a significant issue in the case. Three of the five charges required the State to prove that Westlake acted with "intent": first-degree murder, the lesser included offense of second-degree murder under the theory that Westlake acted with the intent to cause serious physical injury, and evidence tampering. The jury was instructed that voluntary

intoxication can negate an element requiring that the defendant act intentionally with respect to a result.[12]

There was no direct evidence that Westlake had consumed alcohol that evening, but the State introduced evidence that he had purchased beer, that empty beer cans were found in the residence, and that Dean had no alcohol in his blood at the time of his autopsy. The prosecutor argued that the location of the empty beer cans in the residence established that Westlake drank roughly eleven beers the night of the killing.

In closing argument, the prosecutor acknowledged that if the jurors concluded that Westlake killed his father yet found that he was too intoxicated to form intent, "that's a defense" to the charges requiring intent. But the prosecutor encouraged jurors to reject this view, arguing that, while Westlake was intoxicated enough to substantially impair his judgment, he was not so intoxicated that he could not form intent. In contrast, Westlake's attorney argued that the amount of beer the State claimed Westlake consumed would have left him "blacked out" and too intoxicated to form the requisite intent.


*Deliberations*

After several days of jury selection and six and a half days of trial, the jury began deliberating. Deliberations began at roughly 2:00 p.m. on Thursday, March 7, 2024. (The jury did not receive the exhibits until later that afternoon.)

During deliberations, the jury sent a series of notes to the court. About ninety minutes after deliberations commenced, the jury sent its first note, seeking

---

[12] AS 11.81.630 ("Voluntary intoxication is not a defense to a prosecution for an offense, but evidence that the defendant was intoxicated may be offered whenever it is relevant to negate an element of the offense that requires that the defendant intentionally cause a result."); *Neitzel v. State*, 655 P.2d 325, 325-31 (Alaska App. 1982) (discussing the history of AS 11.81.630 and interpreting it not to apply to extreme indifference second-degree murder as set out in AS 11.41.110(a)(2)).

clarification of the difference between manslaughter and extreme indifference second-degree murder; the jury asked for examples of the two crimes and inquired, "Is manslaughter always accidental?"[13] After conferring with the parties, the court provided a response to the jury, explaining the requirements for extreme indifference murder and redirecting the jury to the definition of "recklessly."[14]

Deliberations continued the next morning, when the jury sent two notes asking if it could see additional items (a gas station receipt and a scanned image of the crime scene) that the court responded were not admitted into evidence. The jury also requested (and the court arranged) playback of an officer's testimony.

Deliberations continued until at least noon on Friday, March 8, 2024.[15]

At 8:30 a.m. on Monday, March 11, 2024, the jury sent a note to the court stating that it had reached a decision on Count I (first-degree murder) but had yet to reach a decision on Count II (extreme indifference second-degree murder). The jury then asked, "If we are unable to reach a unanimous decision what do we do?"

The Court responded at 9:10 a.m., referring the jury to two instructions from the initial instruction packet (Instructions Nos. 6 and 12). These instructions stated that the jury must consider each count separately and that it could not return a verdict

---

[13]   The full note read: "Please clarify the difference [between] manslaughter & Count 2. Maybe some examples [between] the two. Is manslaughter always accidental?"

[14]   In its response, the court explained that extreme indifference murder required conduct creating a "very high degree of risk" that "exhibits an extreme disregard of social duty"; the conduct must be more than criminally negligent and reckless conduct, but the defendant need not intend to cause death. The court also provided examples of extreme indifference murder and told the jury that, for purposes of manslaughter, it should rely on the definition of "recklessly" without using the term "accidental."

[15]   It is unclear from the record what time the jury stopped deliberating each day. The jury was instructed that it could deliberate after the court's business hours (8:30 a.m. to 4:30 p.m., Monday to Thursday, and 8:30 a.m. to 12:00 p.m. on Friday), but there is no indication in the record whether they did so.

on the lesser included offense of intentional injury second-degree murder before reaching a not guilty verdict on first-degree murder. The court did not refer the jury to Instruction No. 30, which was a modified *Fields* instruction advising each juror that they had "a duty to consult with one another and to deliberate with a view to reaching an agreement, if that can be done without sacrificing your individual judgment."[16]

The court's response also asked the jury if it had reached unanimous decisions on the remaining counts.

Twenty minutes later, at 9:30 a.m., the jury replied to the court's response. The jury stated that it had reached a unanimous verdict for "Act I" but could not reach a unanimous decision on "Counts 2, 3, 4[,] or the lesser." Simultaneously, however, the jury submitted another note stating, "What is act 2 in the lesser degree. Instruction 8 does not seem clear." (Instruction No. 8 defined the elements of Count II — extreme indifference second-degree murder.)

The court convened to discuss these two notes with the parties. The prosecutor expressed concern that the jury was confused as to which count — Count II (extreme indifference murder) or Count I-A (intentional injury murder) — was the designated lesser included offense. Count I-A was the designated lesser included offense, but the jury seemingly viewed Instruction No. 8 (defining the elements of extreme indifference murder) as the designated lesser included offense — *i.e.*, "act 2 in the lesser degree."[17] But the prosecutor also recognized that if the jury's unanimous

---

[16] When a jury is deadlocked, the trial court may issue an additional instruction to encourage the jury to keep deliberating. *Dere v. State*, 444 P.3d 204, 220 (Alaska App. 2019). The Alaska Supreme Court endorsed specific language for this purpose in *Fields v. State*, 487 P.2d 831, 836-42 (Alaska 1971).

[17] Technically, all of the homicide counts below first-degree murder were lesser included offenses of first-degree murder under the facts of this case. *See Elisovsky v. State*, 592 P.2d 1221, 1225-26 (Alaska 1979) (adopting the cognate approach for determining lesser included offenses under Alaska law). But because the State independently charged extreme indifference second-degree murder and manslaughter, the court and the parties did not treat these counts as strict lesser included offenses. As a result, the court did not instruct

verdict on Count I (first-degree murder) was guilty, that would render the question of the lesser included moot.

Defense counsel expressed concern that "there is confusion in the jury about which instructions relate to which charges" and stated that the instructions needed to be clarified, should deliberations continue. She also maintained that the jury had not been deliberating for long and asked the court to give the jurors additional time to deliberate, along with an instruction stating that they should work together to try to reach a decision on all charged counts, if possible. She proposed language for this requested instruction.[18]

The court declined to give defense counsel's proposed instruction, stating that it was "basically what I just told them in the last response." (The court's previous answer directed the jury only to Instructions Nos. 6 and 12, however, not to Instruction No. 30, which was a closer approximation of the new instruction defense counsel requested.) The court decided to call in the jury and inquire further of the foreperson.

---

the jury that it must acquit on first-degree murder before returning a verdict on extreme indifference murder, or that it must acquit on first-degree murder and both counts of second-degree murder before returning a verdict on manslaughter. We have previously cast doubt on this practice (that is, failing to instruct the jury that it may not return a verdict on a lesser included offense "without also returning a verdict on the greater offense"). *See Dresnek v. State*, 697 P.2d 1059, 1063-64 (Alaska App. 1985). We have no occasion to address this practice under the circumstances of this case, although we note that treating the two different counts of second-degree murder differently — one as a lesser offense and the other as an independent count — and not giving the jury an orderly way to return verdicts on the different counts may have contributed to the jury's confusion.

[18] This proposed instruction read:

> You are not required to return a verdict on a count if you cannot reach a unanimous decision. You are required to work together to try to reach a decision on all charged counts. If you cannot reach a unanimous decision on any count, you must notify the Court. You may still return a verdict on each count on which you have reached a unanimous decision.

After the jury returned to the courtroom, the court told the foreperson that it did not understand what was meant by "act 2 in the lesser."[19] The foreperson stated that there was confusion over whether there was a lesser included charge of Count II (extreme indifference murder) or whether the lesser included charge was associated with Count I (first-degree murder), but the jury had apparently resolved its confusion:

> I think we just realized it. So, we were confused on the — on one of the charges, there's a lesser count. . . . And I believe [we] erroneously thought it was on . . . Count II that there's a lesser charge. . . . But just before we came in here, I read something that made it sound like it's . . . Count I has the murder in the first degree and then murder in the second degree.

The foreperson then noted that the confusion also related to the fact that "with alcohol involved," "it changes the intent." And he suggested: "Maybe we just need a review of the counts. I don't know."

He further explained that he was confused by the verdict forms and the distinctions between the counts:

> And just to add on to that, I also noticed we have five pages of verdicts, which was also — just was causing me some confusion of exactly the difference between murder in the first degree, murder in the second degree, and then Count II, which I thought was murder in the second degree as well, so.

Rather than clarify this confusion or review the counts and send the jury back to deliberate further, the trial court responded, "All right." The court then shifted to the jury's other note, which had indicated that it was deadlocked on the other counts.

Specifically, the trial court asked the foreperson, "Is it still the jury's question, 'We cannot reach a unanimous decision on Counts II, III, IV, or the lesser'? Is that still the question?" The foreperson responded by clarifying: "That's still *a*

---

[19]   The court clarified with the foreperson that by "act," he meant "count."

question." (As Westlake notes on appeal, the emphasis in the juror's response is clear from the audio recording of this exchange, which we have reviewed.)

In response to the foreperson's response, the court simply stated, "Okay." The court did not otherwise engage with the foreperson's statements. Instead, the court moved on to polling the jury.

The court asked each juror, "Do you personally believe that further deliberation by this jury panel will assist the jury panel in reaching a unanimous verdict on any of the Counts II, III, IV, or the lesser?" The poll results were mixed. Two jurors answered, "Yes," four jurors answered, "I don't know," and six jurors answered, "No." The court did not ask the jurors whether additional legal instruction would assist in their deliberations. The jury was then excused at 10:28 a.m.

After the jury was excused, the court expressed surprise at the jury's reaction, stating, "After forty years of doing this, . . . . I've never seen a response like that, ever." The court also stated that its "real gut reaction" was that the jurors who believed no further deliberation would be helpful would not be persuaded.

In contrast, the prosecutor characterized the jury's response as "equivocal" and stated that "nobody seemed very strident in the way they responded." In his view, it "didn't seem to be the case" that the jurors were not getting along, and he stated that he would defer to the court and to defense counsel on how to proceed.

Defense counsel did not comment on the jurors' demeanor during the polling. Rather, she noted, based on the earlier discussion with the foreperson, that the jurors appeared to be "still sort of deciphering what the law they're applying is here." She explained that she had reviewed the verdict form for Count I-A (intentional injury second-degree murder) and saw that it provided jurors with the option of finding Westlake guilty or not guilty of "the lesser included offense of Murder in the Second Degree" — thus implying that there was a lesser included offense *of* second-degree murder, rather than that second-degree murder was *itself* the lesser included offense.

She acknowledged that the jurors appeared to have figured out that there was not a designated lesser included offense of Count II (the other second-degree murder count). She suggested, therefore, that the jury should now be given additional time to deliberate, particularly given that half of the jury had said either that further deliberations would be helpful or that they were not sure (*i.e.*, half did not say "no").

The court determined that, in the first instance, it would advise the jury that if it had reached unanimous agreement as to Count I, the jury should return that verdict. Depending on that verdict, the court would then determine whether further instructions were necessary.

Because the prosecutor had argued in closing that intentional injury second-degree murder was "actually the most appropriate crime" for this offense, the prosecutor told the court that he expected the jury would return a not guilty verdict on Count I. He asked that, if the court ultimately sent the jury back for further deliberations, the court correct the voluntary intoxication instruction.

(Specifically, the voluntary intoxication instruction erroneously implied that voluntary intoxication could only negate the mental state for first-degree murder, rather than any count with a mental state of "intent."[20] When discussing this instruction before deliberations, the parties noted this error and agreed to fix it. It is unclear why this error in the jury instructions was not fixed. But this error incorrectly implied that intoxication could not negate the mental state of "intent" in the designated lesser included offense (intentional injury second-degree murder (Count I-A)) and in the evidence tampering charge (Count IV).)

The court stated that it was not likely to send the jury back for further deliberations. The court noted that the case involved "a single-act event" and that the jury had been deliberating since Thursday afternoon. The court never mentioned the possibility of giving the jury additional instructions on the law.

---

[20]   *See* AS 11.81.630.

The jury was brought back into the courtroom at 11:12 a.m. and asked to return its verdict on Count I (first-degree murder). The jury returned a verdict of not guilty. After accepting the verdict, the court asked the jurors collectively if anyone had changed their position on whether further deliberations would be helpful. No juror responded — *i.e.*, no juror indicated that they had changed their position. The jury was then excused at 11:14 a.m.

After the jury was excused, defense counsel requested that the jurors be given more time to deliberate on the remaining counts, particularly in light of their recent realization about the counts and the lesser included offense. She explained that she had spoken with the prosecutor about some changes to the jury instructions and noted that the voluntary intoxication instruction had the same ambiguous language as the verdict form (referring to the "Lesser Included charge [or offense] *of* Murder in the Second Degree" (emphasis added)). She argued that the foreperson's statements earlier in the day suggested that the jury was still figuring out "what [it] see[s] as the facts and how to apply the law." She later stated:

> So, it's clear that at least some of them, both from the statements that they've made here in court and from their questions, haven't had a totally clear understanding of how to read the instructions[.]

She suggested that, given the number of questions and the time in and out of the courtroom, the jury had not had enough time to deliberate:

> So, I think that this jury is still talking to each other. I think we've heard that. I think we've seen that in their interactions. There's not a — we're not at the point where they have one or two folks that are done talking to anyone else. At least it doesn't seem like that.

She also renewed her request to give the jury a *Fields* instruction.

The prosecutor indicated that he agreed with the court's assessment of the situation and deferred to the court's discretion on how to proceed. The prosecutor noted that there was not a majority of jurors who said that further deliberations would be

fruitful. The prosecutor requested in the alternative that, if deliberations continued, the court provide an answer to the jury's question regarding "act 2 in the lesser degree" and provide additional clarification regarding the interaction between intoxication and the specific intent crimes (to remedy the error in the jury instructions):

> If we are inclined to ask [the jury] to deliberate further, . . . there's one question that we haven't really addressed that they asked us that — about the one instruction, that we actually provide them some response to that question that — and it really does relate to the instructions that [defense counsel] just highlighted, which is the voluntary intoxication, and probably the special verdict form that she highlighted as well earlier.

The court acknowledged that the jury had not "spent days and days" on deliberations but stated there were not a lot of facts to sort through. The court found that for the six jurors who said "no," further deliberations would not be helpful because they were set in their opinion. The court determined that it would declare a mistrial. The court again did not address the possibility of giving additional instructions on the law.

The court then recalled the jury for a final time at 12:08 p.m. The court asked the foreperson if the position of the panel as to the remaining counts had changed. The foreperson responded, "No, we were not discussing" — *i.e.*, the jury had not deliberated in the roughly one hour since it was last in court. The court did not ask the jury if additional legal instruction would be helpful.

Over Westlake's objection, the court determined that the jury was hung and declared a mistrial.

Westlake filed a motion to dismiss the remaining charges against him on double jeopardy grounds. Westlake argued that there was no manifest necessity to dismiss the jury because (1) the jury was confused on the law and the court failed to clarify its confusion or ask if further legal instruction would allow it to break its deadlock; (2) the jury panel did not unanimously state that further deliberations would be fruitless; (3) the court did not issue a *Fields* instruction encouraging jurors to keep

deliberating; and (4) the jury did not have sufficient time to deliberate. The State opposed Westlake's motion. The court denied the motion, determining that the jurors' responses to the polling indicated a hung jury, creating manifest necessity.

This petition for review followed.

*Overview of double jeopardy law and the parties' positions on appeal*

The United States and Alaska Constitutions both prohibit placing an individual into jeopardy twice for the same offense.[21] This constitutional safeguard is "designed to protect an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense."[22]

The prohibition against successive trials is "deeply ingrained" in our legal system.[23] It is rooted in the concept that "the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense."[24] Such successive prosecutions subject a defendant "to embarrassment, expense and ordeal," compel them "to live in a continuing state of anxiety and insecurity," and "enhanc[e] the possibility that even though innocent [they] may be found guilty."[25] Thus, once the jury is sworn and jeopardy has attached, the defendant gains a "valued right to have [their] trial completed by a particular tribunal."[26]

---

[21] U.S. Const. amend. V; Alaska Const. art. I, § 9. The Double Jeopardy Clause of the Fifth Amendment is applicable to the states through the Fourteenth Amendment. *See Benton v. Maryland*, 395 U.S. 784, 794 (1969).

[22] *Green v. United States*, 355 U.S. 184, 187 (1957).

[23] *Id.* at 187-88.

[24] *Id.* at 187.

[25] *Id.* at 187-88.

[26] *Cross v. State*, 813 P.2d 691, 694 (Alaska App. 1991) (quoting *Wade v. Hunter*, 336 U.S. 684, 689 (1949)).

But this right is not costless or boundless. Double jeopardy protections mean there will be instances where "the State will be barred from retrying the defendant, regardless of the strength of the State's evidence."[27] Therefore, "a mechanical rule prohibiting retrial *whenever* circumstances compel the discharge of a jury without the defendant's consent would be too high a price to pay for the added assurance of personal security and freedom from governmental harassment[.]"[28]

Balancing these competing interests, the law provides that, once the jury has been sworn — *i.e.*, once double jeopardy protections have attached — a defendant may not be retried for the same offense *unless* the defendant consented to a mistrial *or* there was "manifest necessity" for granting a mistrial.[29] Thus, if a defendant requests or agrees to declaration of a mistrial, double jeopardy does not bar a subsequent prosecution on the charge, except when the government's actions were designed to provoke the defendant into seeking to terminate the proceeding by requesting a mistrial.[30] But if the defendant objects to a mistrial, as was the case here, the defendant may not be retried unless there was manifest necessity to grant the mistrial.[31]

---

[27]  *Allen v. State*, 366 P.3d 536, 541 (Alaska App. 2016).

[28]  *United States v. Jorn*, 400 U.S. 470, 480 (1971) (emphasis added).

[29]  *Cross*, 813 P.2d at 694 (citing *Arizona v. Washington*, 434 U.S. 497, 505 (1978)); *see* 2A Charles Alan Wright & Peter J. Henning, *Federal Practice and Procedure: Criminal* § 440 at 295-96 (4th ed. 2025) (citing, *inter alia*, *Oregon v. Kennedy*, 456 U.S. 667, 672, 675-76 (1982); *Garrett v. United States*, 471 U.S. 773, 796 (O'Connor, J., concurring)); *Tritt v. State*, 173 P.3d 1017, 1019 (Alaska App. 2008) ("Once jeopardy attaches, the trial may not be stopped short of a verdict unless the defendant consents or there is manifest necessity for a mistrial.").

[30]  Wright & Henning, *supra* note 29.

[31]  *Id.* at 296; *see also Tritt*, 173 P.3d at 1020 (holding that because the defendant objected to a mistrial and there was no manifest necessity, the defendant could not be retried).

As we explained in *Cross v. State*, the "manifest necessity" standard was first articulated by the United States Supreme Court in 1824.[32] In *United States v. Perez*, the Supreme Court stated that a court is empowered to discharge a jury without a verdict if "there is a manifest necessity for the act," but it warned that this authority should "be used with the greatest caution, under urgent circumstances, and for very plain and obvious cases."[33] Given the constitutional principles at stake, we have similarly emphasized that a mistrial should be declared without defense consent only in "very extraordinary and striking circumstances."[34]

A hung jury is the "classic example" of manifest necessity.[35] A jury is hung if there is "no prospect" that the jurors can reach a unanimous verdict.[36] A court is not required to make express findings before determining there is manifest necessity.[37] But "the record must clearly support the trial court's implicit finding [that there is] 'no prospect of agreement'" on a verdict.[38]

As a matter of federal law, it is well established that the government bears the burden of showing the existence of manifest necessity.[39] Alaska law has not yet

---

[32] *Cross*, 813 P.2d at 694.

[33] *United States v. Perez*, 22 U.S. 579, 580 (1824).

[34] *Cross*, 813 P.2d at 694 (quoting *Browning v. State*, 707 P.2d 266, 268 (Alaska App. 1985)).

[35] *Lewis v. State*, 452 P.2d 892, 894 (Alaska 1969) (quoting *Downum v. United States*, 372 U.S. 734, 736 (1963)).

[36] *Koehler v. State*, 519 P.2d 442, 449 (Alaska 1974); *see also Artemie v. State*, 158 P.3d 860, 862-63 (Alaska App. 2007).

[37] *Koehler*, 519 P.2d at 449.

[38] *Id.*

[39] *See Arizona v. Washington*, 434 U.S. 497, 505 (1978) ("[T]he prosecutor must shoulder the burden of justifying the mistrial if [they are] to avoid the double jeopardy bar.

explicitly assigned the burden of proof in the double jeopardy context.[40] But we are required to apply a standard at least as protective as the federal constitution,[41] and we take this opportunity to clarify that, as a matter of Alaska law, the government bears the burden of showing that there was manifest necessity to declare a mistrial if it seeks to continue the prosecution after the jury is dismissed over the defendant's objection.

*Why we conclude that there was no manifest necessity to declare a mistrial*

As discussed above, a jury is hung only if there is "no prospect" of it reaching a unanimous verdict.[42] This is a high bar.[43] The fact that a jury declares that it is deadlocked "does not mean that [it is] 'hung' for purposes of declaring a mistrial."[44]

---

[Their] burden is a heavy one. The prosecutor must demonstrate 'manifest necessity' for any mistrial declared over the objection of the defendant."); Wright & Henning, *supra* note 29, at 300 ("The burden is on the government to establish a manifest necessity for the mistrial by creating the proper record to support the trial court's decision when the judge requests comment.").

[40] *See, e.g.*, *Koehler*, 519 P.2d at 449 (deciding whether there was manifest necessity to dismiss the jury without discussing who bears the burden of proof); *Allen v. State*, 366 P.3d 536, 541 (Alaska App. 2016) (same).

[41] *Fletcher v. State*, 532 P.3d 286, 307 (Alaska App. 2023) ("[U]nder the principles of federalism, the Alaska Constitution must be at least as protective as its federal counterpart.").

[42] *Koehler*, 519 P.2d at 449.

[43] *See, e.g.*, *Allen*, 366 P.3d at 541 (cautioning trial courts that "they must be extremely hesitant to declare a mistrial without the express consent of the defense"); *Whiteaker v. State*, 808 P.2d 270, 276 (Alaska App. 1991) (noting "the 'high degree' of necessity required to justify a mistrial" (quoting *State v. Pugliese*, 422 A.2d 1319, 1321 (N.H. 1980))); s*ee also Illinois v. Somerville*, 410 U.S. 458, 471 (1973) ("The determination by the trial court to abort a criminal proceeding where jeopardy has attached is not one to be lightly undertaken, since the interest of the defendant in having [their] fate determined by the jury first impaneled is itself a weighty one.").

[44] *Dere v. State*, 444 P.3d 204, 220 (Alaska App. 2019).

Our case law is clear that, when faced with a jury that states that it is unable to reach an agreement, "the trial judge must make further inquiry":

> Even when a high degree of necessity exists which would ordinarily justify a mistrial, the trial judge must make further inquiry to determine if an alternative measure — less drastic than a mistrial — would alleviate the problem. If further inquiry could have been made, or alternatives taken to cure the prejudice, the trial court will have abused its discretion in finding manifest necessity.[45]

Here, there were alternative, "less drastic" measures that the court could have and should have taken before declaring a mistrial and discharging the jury. While there is no "rigid formula" for determining whether manifest necessity exists and trial courts generally have broad discretion in this area,[46] this authority is tempered by trial courts' legal duty to instruct the jury on the law and clarify any apparent legal confusion by the jury.[47] This obligation is at its zenith when a defendant's "valued right to have his trial completed by a particular tribunal" is at stake.[48] Thus, as we said in *Cross*, a trial court abuses its discretion "[i]f further inquiry could have been made, or alternatives taken to cure the prejudice."[49]

---

[45] *Cross v. State*, 813 P.2d 691, 694 (Alaska App. 1991); *see also Dere*, 444 P.3d at 221 (noting that "[a] judge should take reasonable, non-coercive measures to see if the jurors can, in fact, reach a verdict").

[46] *Wade v. Hunter*, 336 U.S. 684, 690 (1949); *Tritt v. State*, 173 P.3d 1017, 1019 (Alaska App. 2008) (recognizing that a trial court's decision on a motion for a mistrial is reviewed for an abuse of discretion).

[47] *See Roth v. State*, 329 P.3d 1023, 1026 (Alaska App. 2014) ("[T]rial judges are under a duty to instruct the jurors on all matters of law that they need to make their decision."); *Des Jardins v. State*, 551 P.2d 181, 190 (Alaska 1976) (explaining that trial judges have a duty to provide guidance to a jury when it is confused about a legal issue).

[48] *Koehler v. State*, 519 P.2d 442, 447 (Alaska 1974) (quoting *United States v. Jorn*, 400 U.S. 470, 484 (1971)).

[49] *Cross*, 813 P.2d at 694.

Our decision in *Whiteaker v. State* illustrates this point.[50] There, the defendant was charged with homicide under multiple theories and the jury indicated that it was deadlocked.[51] The trial court found that the jury was hung but, while the court was in the process of excusing the jury, one of the jurors interjected to ask whether the jury could be hung on one charge but not the others.[52] Rather than inquiring about this comment or attempting to clarify whether the jury had reached a verdict on any of the counts, the trial court dismissed the jury over the defendant's objection.[53]

We held that the juror's question "evidenced some possibility of reaching a partial verdict" and that, "upon evidence of confusion among the jurors," the trial court abused its discretion in "refusing to resolve the questions posed by the juror" or to repoll the jury to ensure that no further legal instruction would allow them to reach a unanimous verdict.[54] We thus reversed the defendant's jeopardy-barred conviction.[55]

We reach a similar conclusion here. Fifty years ago, the Alaska Supreme Court emphasized that a trial court has a duty to clarify a jury's legal confusion: "When a jury makes explicit its difficulties, a trial judge should clear them away with concrete accuracy."[56] This principle has been repeated across a broad range of circumstances in

---

[50] *Whiteaker v. State*, 808 P.2d 270, 277 (Alaska App. 1991).

[51] *Id.* at 271-72.

[52] *Id.* at 273.

[53] *Id.*

[54] *Id.* at 277-78.

[55] *Id.* at 279.

[56] *Des Jardins v. State*, 551 P.2d 181, 190 (Alaska 1976) (quoting *Bollenbach v. United States*, 326 U.S. 607, 612-13 (1946)).

both criminal and civil cases.[57] And it applies even if only a single juror is confused because, in the same way that the presence of a single biased juror is improper,[58] a defendant has a "right to have all members of the jury correctly and adequately instructed."[59]

The court need not clarify a matter about which the jury has already received adequate instruction.[60] But when the "jury appears to be confused about a legal issue, and the resolution of the question is not apparent from an earlier instruction, the trial judge has a 'responsibility to give the jury the required guidance by a lucid statement of the relevant legal criteria.'"[61]

Here, the jury's notes, together with the court's in-person communication with the jury, underscore the jury's confusion about key legal issues, and the parties themselves acknowledged a lack of clarity in the original instructions.

---

[57] The Alaska Supreme Court first made this point in *Des Jardins* and has repeated it again in both criminal and civil cases. *Id.* at 189-90; *see Wamser v. State*, 652 P.2d 98, 102 (Alaska 1982); *Chenega Corp. v. Exxon Corp.*, 991 P.2d 769, 776 (Alaska 1999); *Barrett v. Era Aviation, Inc.*, 996 P.2d 101, 105 (Alaska 2000); *Parnell v. Peak Oilfield Serv. Co.*, 174 P.3d 757, 764 (Alaska 2007). We have reiterated this point in published and unpublished cases. *See Compton v. State*, 579 P.3d 850, 864 (Alaska App. 2025); *Bartman v. State*, 563 P.3d 121, 129 (Alaska App. 2025); *Turner v. State*, 552 P.3d 1077, 1081 (Alaska App. 2024); *Roth v. State*, 329 P.3d 1023, 1024-26 (Alaska App. 2014); *Moffitt v. State*, 207 P.3d 593, 602-03 (Alaska App. 2009); *Glidden v. State*, 842 P.2d 604, 611 (Alaska App. 1992); *Grogan v. State*, 2023 WL 6626998, at *2-4 (Alaska App. Oct. 11, 2023) (unpublished); *Phetamphone v. State*, 2020 WL 6305972, at *3 (Alaska App. Oct. 28, 2020) (unpublished); *Littlefield v. State*, 2008 WL 4822916, at *2-3 (Alaska App. Nov. 5, 2008) (unpublished); *Sauve v. State*, 1993 WL 13157150, at *6 (Alaska App. Dec. 15, 1993) (unpublished).

[58] *See, e.g.*, *United States v. Martinez-Salazar*, 528 U.S. 304, 316 (2000).

[59] *State v. Fletcher*, 540 A.2d 370, 372 (Conn. 1988) (citing *State v. Hines*, 445 A.2d 314, 318 (Conn. 1982)); *accord Heywood v. State*, 170 P.3d 1227, 1235 (Wyo. 2007).

[60] *Des Jardins*, 551 P.2d at 190.

[61] *Id.* (quoting *Bollenbach*, 326 U.S. at 612-13).

The jury's legal confusion first appeared in its note requesting clarification on "act 2 in the lesser." The full note read: "What is act 2 in the lesser degree[?] Instruction 8 does not seem clear." (Instruction No. 8 defined the elements of extreme indifference murder, which was *not* the designated lesser included offense.)

This note was sent at the same time as the jury's note stating (in response to the court's inquiry) that it could not reach a unanimous decision on "Counts 2, 3, 4[,] or the lesser."[62] This timing strongly implied that resolution of the legal issue might help break the deadlock; there would be little reason to send a note inquiring into the instructions unless the jury believed resolution of this issue would assist in breaking its deadlock.

When the court brought the jury into the courtroom, the foreperson, on behalf of the jury, suggested that the jury may have resolved its confusion on its own, stating, "I think we just realized it." But the foreperson also stated that the distinction mattered because voluntary intoxication could negate "intent": "Count I has the murder in the first degree and then murder in the second degree. And I guess . . . the confusion was that . . . with alcohol involved that it changes the intent."

The foreperson then made two additional significant statements. First, the foreperson stated that "maybe we just need a review of the counts. I don't know." Second, the foreperson stated that he was confused about the distinction between the different murder counts: "And just to add on to that, I also noticed we have five pages of verdicts, which was . . . just was causing me some confusion of exactly the difference between murder in the first degree, murder in the second degree, and then Count II, which I thought was murder in the second degree as well." This statement reflected

---

[62] This note distinguished Count II from the "lesser," but it was a response to the court's inquiry asking if the jury could reach a unanimous decision on "Counts 3, 4, and the lesser-included count" (which in turn was a response to the jury's note inquiring about how to proceed if they could not reach a verdict on Count II).

confusion — at least on the part of the foreperson — as to the distinctions between the offenses and underscored his request for "a review of the counts."

These statements called for legal clarification and additional time for the jury to deliberate in light of those clarifications. Indeed, over the course of the ensuing discussions with the parties about how to proceed, both defense counsel and the prosecutor noted ambiguities in the original legal instructions: (1) in the voluntary intoxication instruction, which erroneously implied that the instruction might only apply to first-degree murder, and (2) in various references (both in the instruction and in the verdict form) to "the lesser offense *of* murder in the second degree."

But instead of giving additional legal instruction, or even inquiring if additional instruction would be helpful, the judge responded, "All right," and moved to the jury's second note, stating that it was deadlocked on all counts other than Count I. Here again, the court did not respond to a cue from the foreperson. The court asked the foreperson, "Is it still the jury's question, 'We cannot reach a unanimous decision on Counts II, III, IV, or the lesser'? Is that still the question?" The foreperson responded by correcting the court: "That's still *a* question." This response indicated that the issue of how to proceed in the event of a deadlock was not the jury's only outstanding question and that the jury was still engaged in the decision-making process.

The court did not follow up on any of these alerts. The court did not inquire about the foreperson's emphasis that the court was only addressing "*a* question" from the jury. The court did not respond to the foreperson's request for a "review of the counts" or address his apparent confusion about "exactly the difference between" the outstanding murder charges. The court did not provide an answer to the jury's question regarding "act 2 in the lesser." And the court did not correct the erroneous voluntary intoxication instruction and reinstruct the jury on this topic. Instead, the court ultimately dismissed the jury without providing any further legal instruction or inquiring if additional legal instructions would assist the jury in reaching a unanimous decision. And it did so after only half the jury indicated that further deliberations would not help.

Given the jury's confusion about the law, the court's determination that a mistrial was the least drastic option was an abuse of discretion.[63] Answering the jury's outstanding questions or inquiring if further legal instruction would assist the jury in breaking their deadlock were both less drastic alternatives.

We acknowledge the court's concern about the coercive effect of sending the jury back for further deliberations.[64] But even in situations where a jury indicates it is deadlocked, without any apparent confusion on the law, the law authorizes the court to give a *Fields* instruction and order continued deliberations. The risk of coercion is vastly reduced in a situation where the jury sends a note inquiring about the jury instructions and invites additional instruction. A jury in such a situation might even expect additional instructions and additional deliberations.

Here, the court's failure to inquire whether additional legal instruction would assist was magnified by the procedural posture of deliberations: the jury had only deliberated for two partial days after a six-and-a-half-day trial before indicating at the start of the third day that it had not reached a unanimous decision on Count II (and then, an hour later, declaring itself deadlocked on all counts other than Count I). The jury asked several questions over that span of deliberations and spent time listening to audio playbacks, which further reduced the time spent actually discussing the case.

After polling the jurors, the trial court believed that the jurors were set in their views and that their reactions were unlike anything the court had encountered in its forty years on the bench. But this assessment was not shared by the prosecutor, who characterized the responses as "equivocal" and stated that "nobody seemed very strident in the way they responded." Moreover, the fact that half of the jurors either believed

---

[63] *See Cross v. State*, 813 P.2d 691, 694 (Alaska App. 1991).

[64] *See Artemie v. State*, 158 P.3d 860, 863 (Alaska App. 2007) (recognizing that requiring continued "deliberations despite genuine and irreconcilable disagreement" may "defeat[] the ends of public justice" by "coerc[ing] erroneous verdicts" (quoting *United States v. Goldstein*, 479 F.2d 1061, 1068 (2d Cir. 1973))).

further deliberation would be helpful or stated that they were unsure on that point indicates that the jury's deadlock was potentially breakable and not the result of an intractable set of differing beliefs about the case.

The State raises two main arguments in support of the trial court's determination that a mistrial was manifestly necessary.

First, the State argues that the record shows that the jury had no outstanding legal questions and that further instructions would not have assisted it in reaching a verdict. The State argues that the jury resolved its confusion regarding "act 2" on their own. In particular, the State points to the foreperson's statement, "I think we just realized it," and defense counsel's comments that the foreperson's statement indicated the jury resolved its confusion regarding "act 2."

But the foreperson's statement that "we just realized it" is undercut by his subsequent request for a "review of the counts" and his expressed confusion about the verdict forms and the distinctions between the murder counts.

Moreover, even though defense counsel recognized that the jury may have realized that there was not a lesser included offense of Count II (extreme indifference murder), defense counsel nonetheless asserted that the jurors appeared to be "still sort of deciphering what the law they're applying is here." She also said that, given this realization, the jury should be given additional time to deliberate.

And later, after the jury had returned its verdict on first-degree murder, defense counsel again encouraged additional deliberations and noted the ambiguous language in the voluntary intoxication instruction, explaining that she had spoken with the prosecutor about making some changes to the jury instructions. Defense counsel asserted that it was "clear that at least some of [the jurors], both from the statements that they've made here in court and from their questions, haven't had a totally clear understanding of how to read the instructions or their task."

Furthermore, although the prosecutor ultimately agreed with the court's decision on how to proceed, the prosecutor acknowledged, shortly before the jury was

discharged, that "there's one question that we haven't really addressed that [the jury] asked us." The prosecutor appeared to be referring to the jury's note regarding "act 2 in the lesser," and he stated that this question "does relate to the instructions that [defense counsel] just highlighted" — *i.e.*, the voluntary intoxication instruction and the verdict form. The prosecutor asked the court to provide the jury with an answer to that question if deliberations continued. The prosecutor also noted the ambiguity in the voluntary intoxication instruction. For these reasons, we reject the State's first contention.

Second, the State argues that the facts of this case and how it was litigated show that the jury was deadlocked due to factual disagreement over who beat Dean to death. The State argues that any further legal instructions would not have assisted in breaking this factual deadlock.

But it is difficult to know what was dividing the jury.[65] And even accepting (for the sake of argument) the State's claim that the jury was factually deadlocked on the identity of the perpetrator, further instructions still could have produced verdicts. Specifically, even with this factual split, the jury still could have agreed on an acquittal for any count requiring the State to prove intent with respect to a result. This is because the jury did not need to be unanimous in its theory for acquittal.[66] Thus, the jury could still return a verdict of not guilty if six jurors had reasonable doubt that Westlake killed his father and six jurors believed that he did kill his father but was too intoxicated to form the intent to cause serious physical injury. And a jury is not completely deadlocked if there is even one count it has a prospect of returning a unanimous verdict on.[67] As a

---

[65] Because the trial court may not inquire into the basis for the jury's disagreement, it is impossible to know the specific positions of the jurors. *See Smith v. United States*, 599 U.S. 236, 252-53 (2023).

[66] *Cf. Taylor v. State*, 400 P.3d 130, 135 (Alaska App. 2017) (holding that the jury "did not need to reach unanimity regarding the theory that made this act of eluding a felony-level offense").

[67] *Whiteaker v. State*, 808 P.2d 270, 277-78 (Alaska App. 1991).

result, even fully accepting the State's claim still shows that answering the jury's legal questions could have allowed it to return a verdict on at least one of the remaining counts.[68]

Moreover, there appeared to be lingering confusion, at least on the part of the foreperson, about Count II (extreme indifference murder). The foreperson stated that he was confused about "exactly the difference between murder in the first degree, murder in the second degree, and then Count II, which I thought was murder in the second degree as well." We also note that, early in deliberations, the jury's first note suggested that it was wrestling with the mental state distinctions between extreme indifference murder and manslaughter, and not exclusively identity.

Finally, as we noted earlier, "manifest necessity" is necessarily a high standard because of the double jeopardy implications of ending a trial short of a verdict.[69] Only in the most "extraordinary and striking circumstances" may the court grant a mistrial over the defendant's objection.[70] And the State bears the "heavy" burden of demonstrating manifest necessity.[71]

Here, the State's argument rests upon speculation about the jurors' points of disagreement. But there are no places in the record that clearly support the State's theory that further legal instruction would not create a prospect of the jury returning a unanimous verdict. The trial court made no explicit findings regarding the jury's need for further legal instruction prior to dismissing the panel, and the court never asked the jury whether such instructions would assist in breaking the deadlock. When later

---

[68] At oral argument, the State took the position that the record was inconsistent with there being manifest necessity to dismiss the jury on some but not all of the counts.

[69] *Tritt v. State*, 173 P.3d 1017, 1019 (Alaska App 2008).

[70] *Id.* (quoting *Browning v. State*, 707 P.2d 266, 268 (Alaska App. 1985)).

[71] *Arizona v. Washington*, 434 U.S. 497, 505 (1978).

denying the motion to dismiss, the trial court noted that it had spoken with the jurors after they were discharged and that "nothing disabused [the court] of [its] firm belief . . . that [the] jury was never going to reach unanimous verdicts." But this recitation of the trial court's *ex parte* conversation was not evidence and cannot be considered part of the record.[72]

The State therefore did not meet its heavy burden of showing manifest necessity for a mistrial, and on this record, it was an abuse of discretion for the court to discharge the jury over Westlake's objection.[73]

To be clear, the error in this case arose from the failure to follow up on the express legal confusion of the jurors. We will not deem an instruction confusing (and thus requiring clarification) merely because counsel can later suggest ways in which the jury might have been confused. As in *Whiteaker*, we decline to place a general "burden on the trial judge to *sua sponte* inquire further or perform a special poll of jurors" to ensure that no further legal instruction would assist in breaking their deadlock.[74]

---

[72]   *See* Alaska R. Evid. 605 ("The judge presiding at the trial may not testify in that trial as a witness. No objection need be made in order to preserve the point."); *United States v. Bonas*, 344 F.3d 945, 949-51 (9th Cir. 2003) (holding there was no manifest necessity to dismiss jurors because the only statements in the record supporting the manifest necessity were the trial court's recitation of its *ex parte* conversation with the jurors, which was not proper evidence under federal equivalent to Alaska Evidence Rule 605); *see also* Alaska Commission on Judicial Conduct, Advisory Opinion #2009-01, *Judge's post-verdict communication with discharged jurors* (Nov. 12, 2009) (stating that "judges should avoid direct communication that goes beyond appreciation for service with a discharged jury that has not reached a verdict").

[73]   *See United States v. McIntosh*, 380 F.3d 548, 553 (1st Cir. 2004); *Bonas*, 344 F.3d at 951 ("By bypassing the opportunity to urge the district court to make a record supporting its finding of manifest necessity, the government forfeited the right to try the defendant again.").

[74]   *Whiteaker v. State*, 808 P.2d 270, 278 (Alaska App. 1991); *see also United States v. Jorn*, 400 U.S. 470, 481 (1971) (noting that the manifest necessity inquiry requires "taking all the circumstances into consideration" and that "it is impossible to define all the

But, as we also said in *Whiteaker*, "upon evidence of confusion among the jurors, a different rule must apply."[75] If a jury that is seemingly deadlocked is also confused on the relevant law and the defendant objects to a mistrial, then the trial court must inquire about whether further legal instruction would assist in breaking the deadlock, must ensure the jury's confusion is clarified and that the jury is given an opportunity to deliberate freed from that legal confusion, or must ensure the record clearly shows that further legal instruction would not assist the jury in breaking its deadlock. And if the State wishes to retry a defendant, then it should ensure that the trial court makes a sufficiently clear record that the jury is not deadlocked due to solvable legal confusion, because the State bears the burden of establishing manifest necessity.[76]

*Conclusion*

For the reasons stated above, we REVERSE the trial court's denial of Westlake's motion to dismiss.

---

circumstances[ that] which would render it proper to interfere" (quoting *United States v. Perez*, 22 U.S. 579, 580 (1824))).

[75] *Whiteaker*, 808 P.2d at 277.

[76] *Arizona v. Washington*, 434 U.S. 497, 505 (1978); *Bonas*, 344 F.3d at 951 ("[I]f the government wished to retain the right to retry defendant before another jury, it had both the duty and the incentive to ensure that the court's finding of manifest necessity was supported by evidence on the record.").