IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. CROUSE

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

FREDRICK C. CROUSE, APPELLANT.

Filed May 19, 2026.    No. A-25-213.

Appeal from the District Court for Butler County: CHRISTINA M. MARROQUIN, Judge. Affirmed.

Chad Wythers, of Wythers Law Firm, for appellant.

Michael T. Hilgers, Attorney General, and Jordan Osborne for appellee.

RIEDMANN, Chief Judge, and BISHOP and WELCH, Judges.

BISHOP, Judge.

## I. INTRODUCTION

After a jury trial in the Butler County District Court, Fredrick C. Crouse was convicted of first degree sexual assault of a child. On appeal, Crouse contends that his custodial statement to law enforcement was presented to the jury without a judicial determination that it was freely and voluntarily made. He also claims that the district court erroneously overruled certain hearsay objections made at trial and that his trial counsel was ineffective. We affirm.

## II. BACKGROUND

In December 2023, Deena S. dropped off her two daughters, M.L. (age 7) and L.L. (age 11), at the home of the children's paternal grandmother, in David City, Nebraska, for a weekend stay. A friend of L.L. from school, E.K. (age 12), also stayed over that weekend. During the visit,

- 1 -

L.L. and E.K. shared a bedroom in the home while M.L. and the grandmother slept on the floor on an air mattress in the living room.

On the second day of the sleepover, the group picked up Crouse, the grandmother's then-boyfriend, from his home in Ulysses, Nebraska, and returned to the grandmother's residence to celebrate a combined Thanksgiving and Christmas. Later that evening, M.L., Crouse, and the grandmother went to lay down on the air mattress. L.L. and E.K. retired to the bedroom. At some point in the night, L.L. left the bedroom to use the restroom and observed Crouse on the air mattress "licking [M.L.'s] crotch area" as the grandmother slept. L.L. retreated to the bedroom, informed E.K. about what she saw, and soon after, M.L. entered. Fearful that Crouse might come into the bedroom, the three girls stacked furniture in front of the door and snuck out of the home through a window. They walked several blocks to a local park, phoned 911, and eventually made their way to a nearby emergency room. While at the hospital, M.L. disclosed that Crouse had forcibly removed her underwear.

After a sexual assault investigation, the State charged Crouse by information with first degree sexual assault of a child, a Class IB felony, in violation of Neb. Rev. Stat. § 28-319.01(1)(a) (Reissue 2016). Section 28-319.01(1)(a) makes it unlawful for a person "at least nineteen years of age or older" to "subject[] another person under twelve years of age to sexual penetration."

A two-day jury trial was held in July 2024. Testimony was elicited from multiple witnesses, including the three minor children, Deena, various medical professionals, police officers, and a DNA analyst. The evidence established that Crouse, born in 1973, was 50 years old at the time of the sexual assault. As such, the main factual issue to be resolved by the jury was whether Crouse sexually penetrated M.L.

## 1. TRIAL EVIDENCE

### (a) L.L. and E.K.'s Testimony

L.L. and E.K. were both called as witnesses by the State. Regarding the sexual assault, L.L. testified that in the late hours of December 2, 2023, she left her bedroom to use the restroom. After exiting the bathroom, L.L. saw "Rosie," her great grandfather's dog, sitting on the edge of the air mattress "looking sad." Concerned for Rosie, L.L. went to check on the dog. When she approached Rosie, L.L. "turned [her] head to see [Crouse]'s head in [M.L.'s] crotch area." According to L.L., Crouse's head was "between" M.L.'s legs, and he was "licking" M.L.'s "crotch area." M.L.'s nightgown was pulled up to her "stomach area," and M.L. was not wearing any underwear. L.L. testified that M.L.'s eyes were "really wide," and "she looked scared as if she was about to cry but couldn't." L.L. was a "little bit less than a foot away" from Crouse. The grandmother was asleep on the air mattress. The only light in the living room emanated from a television positioned in front of the air mattress. After L.L. saw Crouse's "head turn," she quickly went back to her bedroom.

Upon returning to the bedroom, L.L. told E.K. that she saw Crouse "inappropriately touching" M.L. The two began devising a plan to escape the grandmother's home. About 3 minutes later, M.L. entered the bedroom and looked like "she was about to cry." E.K. began to put furniture in front of the bedroom door, so Crouse could not enter. Using a pocketknife, L.L. "peel[ed]" the paint off a sealed window in the bedroom. The three girls exited the home through the window and began traveling to a nearby park. While walking, L.L. asked M.L. if she felt "anything weird

and slimy down in her private girl areas," and M.L. responded in the affirmative. E.K. corroborated most of these events in her testimony.

After walking a few blocks, the girls stopped at a bench. L.L. used E.K.'s cellphone to contact 911, and a recording of that call was received into evidence at trial without objection. In the recording, L.L. tells the 911 operator that she "walked in on [her] grandpa raping" M.L. She also informed the operator that Crouse "was on top of [M.L.] licking her area." The operator told the girls to go to a hospital that was across the street from their location.

### (b) Emergency Room

Upon entering the hospital, the three girls were greeted by two emergency room nurses. The girls "appeared to be frantic, [] nervous and scared." L.L. "immediately" told the nurses that M.L. "needed help" because she "had been raped." M.L. was then taken by one of the nurses to be medically assessed. The nurse testified that M.L. was "scared and fearful" throughout the assessment and "didn't speak a whole lot initially." However, M.L. eventually told the nurse that Crouse "had told her to pull her panties down." Despite telling him "no a couple of times," Crouse "continued to pull [M.L.'s] panties down." This testimony was objected to by Crouse as hearsay, but the district court overruled the objection. When asked about Crouse's "positioning," M.L. "kept pointing down" "[t]owards her private area." According to the nurse, M.L. indicated that she felt "something hard" and motioned down to her "vaginal area." After the nurse completed her initial assessment, a doctor was called to conduct another medical evaluation of M.L.

Deena received a "panicked" phone call from L.L. sometime between 11 p.m. and midnight, telling her to get to the hospital quickly. Upon arrival, she was escorted to M.L.'s room. Deena testified that M.L. was "hysterical," crying, "Mommy, don't make me go back." When Deena asked M.L. what happened, she responded, "I don't know." Deena then observed the medical evaluation conducted by the doctor. According to Deena, the doctor who performed the examination had been M.L. and L.L.'s physician "since they were real young." Deena testified, over Crouse's hearsay objection, that M.L. "told the doctor" that Crouse "told her to take her pants and undies off," despite telling him "no." After the medical evaluation was complete, M.L. was discharged, and Deena took her home.

### (c) M.L.'s Forensic Interview and Testimony

The following day, M.L. and L.L. were taken to the Child Advocacy Center in Lincoln, Nebraska. Both girls participated in separate forensic interviews. A recording of M.L.'s interview was received as evidence at trial over various objections by Crouse. The recording was played in its entirety to the jury. During her interview, M.L. told the interviewer that she was "laying in bed with [her] grandpa, and he told [her] to pull down [her] underpants." M.L. explained that she "was scared" when Crouse forcibly removed her underwear. M.L. stated she tried to "push him away" by pressing on his "shoulder." However, whenever M.L. was asked to elaborate or provide more specifics about the assault, she responded, "I don't know."

M.L.'s in-court testimony was largely similar to her forensic interview. When asked by the State what Crouse "did," M.L. testified that she could not recall. Although M.L. refused to provide any concrete information about the sexual assault during her testimony, she confirmed that Crouse

was on the air mattress with her and that she left the air mattress at some point to go to L.L.'s and E.K.'s bedroom.

### (d) SANE Report and DNA Evidence

After M.L.'s appointment at the Child Advocacy Center, she was taken to Bryan Hospital in Lincoln for a sexual assault examination. A registered sexual assault nurse examiner (SANE) testified that she conducted an evaluation of M.L. and filled out a "pediatric examination form" (the SANE report). According to the nurse, the SANE report is a standardized form used to assist examiners in documenting information obtained during their evaluations. The SANE report in this case was prepared during the medical examination and included the nurse's personal observations of M.L.'s physical appearance, along with background information provided by Deena. As part of the evaluation, the nurse took swabs from M.L.'s mouth, fingernails, mons pubis, labia majora, and anus.

The SANE report was received as evidence over Crouse's hearsay and confrontation objections. The document noted M.L. had "[g]eneralized redness" on her labia majora and hymen. The nurse testified that both areas constitute parts of the female genitalia. According to the nurse, this redness "could be" consistent with an injury arising from oral sex. However, on cross-examination, the nurse agreed that a "rash on a vaginal area could be caused by plenty of things."

On March 7, 2024, law enforcement executed a search warrant on Crouse and collected buccal swabs from the inside of his cheek. The samples recovered from M.L. and Crouse were sent to the Nebraska State Patrol Crime Laboratory for testing. The forensic scientist who performed DNA analysis on the samples was called as a witness at trial. The analyst testified that male DNA was detected on the "external genital swabs" taken from M.L. However, no further analysis could be completed because "there was so much female DNA present." Male DNA was also detected on the swabs from M.L.'s mons pubis, and presumptive tests of these swabs "were positive for saliva." Using Crouse's buccal swabs as reference samples, the analyst compared the DNA mixture found on M.L.'s mons pubis and made the following conclusion:

> The mixture of DNA [from M.L.'s mons pubis] is 2.61 times ten to the 17th times more likely it had originated from [M.L.] and Fredrick Crouse than if it had originated from [M.L.] and an unknown, unrelated individual. This is support that both [M.L.] and Fredrick Crouse can be included as contributors to the mixture of DNA.

Two reports authored by the analyst detailing these findings were received at trial without objection.

### (e) Crouse's Law Enforcement Interview

The day after the sexual assault, Officer Stacia Nelson of the David City Police Department contacted Crouse and the grandmother via telephone, seeking to set up an interview to discuss the incident. According to the officer, they initially agreed to an interview but "did not come." Officer Nelson called Crouse and the grandmother a second time and similarly requested they come speak with her. They again agreed to the interview but failed to appear. After receiving a tip earlier in

- 4 -

the day that the grandmother's mental health was deteriorating, the officer traveled to Crouse's home in Ulysses to "check on her" and arrived "around 9:30 at night."

Officer Nelson testified that Crouse and the grandmother voluntarily let her and a deputy from the Butler County Sheriff's Office into the home. Footage from Officer Nelson's body-worn camera was admitted as evidence at trial. At the start of the footage, the deputy accompanying Officer Nelson opens the front door to the house that leads to a small, enclosed porch separated from the rest of the residence by another door. The deputy proceeds to knock on this second door, and the grandmother answers. The deputy requests permission to enter the premises, and the grandmother can be seen waving the deputy and Officer Nelson into the home.

Officer Nelson described the atmosphere in Crouse's home as "very chaotic" due to the barking of several dogs. The officer believed it would not be productive to carry on a conversation at Crouse's home, so she asked Crouse if he would do an interview at another location. Crouse agreed and voluntarily left with Officer Nelson. According to the officer, Crouse was not placed under arrest or restrained in any way. After a brief stop at the grandmother's home to retrieve M.L. and L.L.'s backpacks, Crouse was transported to the unsecured "Butler County Supervisor's Room located [] in the courthouse." Crouse was advised of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and signed a written waiver, which was received without objection at trial. Although Officer Nelson believed her body-worn camera recorded the interview with Crouse at the courthouse, there was an electronic malfunction. No footage from the interview was recoverable.

Officer Nelson testified that throughout her interview of Crouse, he continuously "changed his story." Crouse first denied having "any contact with the children" but later stated he "did place [M.L.] on the bed with him at some point." Crouse indicated that he eventually fell asleep only to be awakened when M.L. "shoved her device" in his face. Crouse then contradicted himself, claiming he woke up after smelling M.L.'s "stinky feet." Crouse also told the officer that "it was inappropriate to have contact with female children" and that "he was never left alone" with his own children. At no point did Crouse ever confess to the sexual assault of M.L. The interview lasted around 30 to 45 minutes.

Crouse did not present any evidence at trial.

### 2. VERDICT, SENTENCE, AND REINSTATEMENT OF DIRECT APPEAL

The jury found Crouse guilty of first degree sexual assault of a child. On November 26, 2024, the district court sentenced Crouse to 20 to 40 years' imprisonment.

After the pronouncement of sentence, Crouse, through trial counsel, attempted to perfect an appeal. However, due to defects in the poverty affidavit, his appeal was dismissed for lack of jurisdiction. Crouse subsequently filed a motion for postconviction relief in the district court. The court granted relief on February 18, 2025, finding the errors in the poverty affidavit were attributable to trial counsel's deficient performance. Crouse's right to direct appeal was reinstated, and his case is now properly before us.

- 5 -

## III. ASSIGNMENTS OF ERROR

Crouse assigns, reordered, that the district court erred in (1) "allowing [his] custodial statement to be presented to the jury without judicial determination that the statement was freely and voluntarily made," and (2) overruling certain hearsay objections made at trial.

He also assigns (3) that his trial counsel was ineffective by (a) failing to object to testimony elicited from the SANE; (b) failing to communicate a plea offer to him with enough time to adequately consider it; (c) failing to object to specific testimony from several witnesses as inadmissible hearsay; (d) failing to file a motion to suppress the statements made to police; (e) failing to request a jury instruction for attempted first degree sexual assault of a child; and (f) failing to consult with him about "any trial issues, including whether [he] should testify at trial."

## IV. STANDARDS OF REVIEW

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Kruger*, 320 Neb. 361, 27 N.W.3d 398 (2025).

Hearsay is not admissible except as provided by the Nebraska Evidence Rules. *State v. Hagens*, 320 Neb. 65, 26 N.W.3d 174 (2025). Apart from rulings under the residual hearsay exception, an appellate court reviews for clear error the factual findings underpinning a trial court's hearsay ruling and reviews de novo the court's ultimate determination to admit evidence over a hearsay objection or exclude evidence on hearsay grounds. *Id.* In a de novo review, an appellate court reaches a conclusion independent of the trial court. *Id.*

Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. *State v. Blaha*, 303 Neb. 415, 929 N.W.2d 494 (2019). In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *Id.*

## V. ANALYSIS

### 1. *Jackson v. Denno* Hearing

We first address Crouse's argument that the district court erred in admitting his custodial statements into evidence without first determining whether the statements were freely and voluntarily made. Citing to *Jackson v. Denno*, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964), he contends that a trial court is constitutionally obligated to inquire into the voluntariness of a defendant's custodial statements, regardless of whether the defendant affirmatively raises the issue before or during trial.

The Due Process Clause of the Fourteenth Amendment and article I, § 3 of the Nebraska Constitution preclude the admissibility of an involuntary statement or confession by a criminal defendant. See *State v. Harris*, 263 Neb. 331, 640 N.W.2d 24 (2002). A defendant in a criminal case is deprived of due process of law if his or her conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession. *Jackson v.*

*Denno, supra*. In *Jackson*, the U.S. Supreme Court held that a defendant objecting to the admission of a confession is entitled to a fair hearing in which both the underlying factual issues and the voluntariness of his or her confession are actually and reliably determined. Trial courts must institute fair procedures to determine whether a confession is voluntary, because involuntary or coerced confessions cannot be introduced into evidence. *State v. Miller*, 312 Neb. 17, 978 N.W.2d 19 (2022).

Neb. Rev. Stat. § 29-115 (Reissue 2016) sets forth the procedure by which a criminal defendant may challenge the admission of statements alleged to be involuntary. Section 29-115 specifically provides that "[a]ny person aggrieved by a statement taken from him or her which is not a voluntary statement . . . may move for suppression of such statement as evidence against him or her," but the motion "must be filed at least ten days before trial." All objections to the introduction of involuntary statements at trial are deemed waived if not raised by a timely pretrial motion. See *id.* However, § 29-115 expressly permits a trial court to entertain a motion made after the commencement of trial where a defendant is surprised by the introduction of the statement, a defendant is not aware of the grounds for the motion before trial, or in other situations where justice may require. See *id.*

Crouse readily acknowledges that he did not file a pretrial motion to suppress within the timeframe prescribed by § 29-115, and he made no objection or motion at trial seeking to exclude his statements on the ground that they were involuntarily made. Instead, he asserts that the statutory deadline for challenging an involuntary statement under § 29-115 "contradict[s] the holding in *Jackson v. Denno*." Brief for appellant at 14. Crouse claims that the Due Process Clause of the Fourteenth Amendment and article I, § 3 of the Nebraska Constitution create an "independent duty" such that a trial court must "determine the voluntariness of a confession . . . regardless of whether a motion is filed." Brief for appellant at 14. In other words, Crouse seems to argue that a trial court is constitutionally required to inquire into the voluntariness of a defendant's statements sua sponte, without any motion, objection, or other prompting by the accused.

Insofar as Crouse argues that the pretrial motion requirement for challenging an involuntary statement set forth in § 29-115 is unconstitutional, he has not preserved the issue for appellate review. Crouse did not challenge the constitutionality of § 29-115 at any point in the proceedings below. An issue of constitutionality must be specifically called to the trial court's attention in some way so that the court has an opportunity to rule upon it, and if not so raised, the issue will be considered to have been forfeited. See *State v. Kalita*, 317 Neb. 906, 12 N.W.3d 499 (2024).

We are likewise unpersuaded that the district court was obligated to hold a hearing sua sponte to determine whether Crouse's statements to police were voluntary, despite the fact that no request for a hearing was made. Crouse does not direct us to any Nebraska authority which stands for such a rule. Rather, the Nebraska Supreme Court has previously stated that a defendant "'may request a hearing on and a determination of voluntariness, but in the absence of such request, [a] defendant cannot complain of the failure of the court to hold such a hearing and make such determination.'" *State v. Warren*, 227 Neb. 160, 162-63, 416 N.W.2d 249, 251 (1987) (quoting *State v. Oliva*, 183 Neb. 620, 625, 163 N.W.2d 112, 115 (1968)).

However, Crouse relies on a lone federal appellate case to support his argument, *Lufkins v. Solem*, 716 F.2d 532 (8th Cir. 1983). In *Lufkins*, a defendant was sentenced to life imprisonment

by a state trial court after a conviction for voluntary manslaughter. Prior to his trial, the defendant offered a handwritten objection to the court, challenging the voluntariness of a confession he signed in the presence of a sheriff. The sheriff was subsequently called as a witness at trial, and the defendant's incriminating statements were offered into evidence. The defendant's trial counsel objected, arguing that the defendant's statements were made involuntarily, but the objection was overruled. After his conviction was affirmed by the state's highest court, the defendant applied for a writ of habeas corpus in federal court. The writ was granted by the U.S. District Court, and the U.S. Court of Appeals for the Eighth Circuit affirmed, finding that no distinct finding on the voluntariness of the defendant's confession had been made by the state trial court prior to the confession's admission at trial, in violation of *Jackson v. Denno, supra*.

According to Crouse, *Lufkins* demonstrates that he was "entitled to a finding of voluntariness [by the district court] regardless of whether trial counsel filed a motion to suppress." Brief for appellant at 14. However, we note that in a subsequent case, the Eighth Circuit rejected this same argument, emphatically declaring that a trial court "has no duty to hold a hearing on the voluntariness of a confession when the defendant does not make a timely objection." *Patterson v. U.S.*, 133 F.3d 645, 648 (8th Cir. 1998). It further noted that "[t]here is not legal support for the idea that a [trial] court must hold a hearing on voluntariness without an objection by the defendant." *Id.* Unlike the defendant in *Lufkins*, Crouse at no point objected to the admission of his statements at trial as being involuntary, nor were any motions or objections filed prior to trial to alert the district court of the issue.

Accordingly, Crouse's constitutional right to due process of law was not violated in this case, and the district court did not err in admitting his custodial statements as evidence at trial.

### 2. Hearsay Objections

Crouse next argues that the district court erred in overruling two hearsay objections raised during trial. The first was made when Deena was asked to testify to statements M.L. gave to a doctor shortly after the sexual assault. Crouse also challenged the admission of the SANE report on hearsay grounds. We conclude that the court did not err in overruling either objection.

### (a) M.L.'s Statements to Emergency Room Doctor

At trial, Deena testified to statements M.L. made to a doctor at the emergency room during a medical examination. Deena specifically stated M.L. "told the doctor" that Crouse "told her to take her pants and undies off," and after M.L. refused, Crouse "did it anyways." These statements were admitted as evidence by the district court over Crouse's hearsay objection. Although the court did not explain the basis for its ruling, both Crouse and the State agree that Neb. Rev. Stat. § 27-803(4) (Cum. Supp. 2024) (statements made for purpose of medical diagnosis or treatment) is implicated.

Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. *State v. Clark*, 315 Neb. 736, 1 N.W.3d 487 (2024). See, also, Neb. Rev. Stat. § 27-801(3) (Reissue 2016). Hearsay is not admissible unless otherwise provided for in the Nebraska Evidence Rules or elsewhere. *State v. Clark, supra*. See, also, Neb. Rev. Stat. § 27-802 (Reissue 2016).

We note that Deena's trial testimony recounted two separate out-of-court statements: (1) Crouse's statement to M.L. before perpetrating the sexual assault and (2) M.L.'s statement relating Crouse's words to the doctor. Hearsay included within hearsay, or "double hearsay," is not excluded under the hearsay rule if each part of the combined statements conforms with an exception or exclusion to the hearsay rule provided in the Nebraska Rules of Evidence. See *State v. Corral*, 318 Neb. 940, 20 N.W.3d 372 (2025). See, also, Neb. Rev. Stat. § 27-805 (Reissue 2016). In other words, when an out-of-court statement relates the content of another out-of-court statement, there must be an independent hearsay exception for each statement. *State v. Corral, supra*.

Crouse's out-of-court statement commanding M.L. to "take her pants and undies off" was his own statement offered against him at trial, qualifying as a statement of a party opponent. See § 27-801(4)(b)(i). Under the Nebraska Rules of Evidence, statements of a party opponent are "not hearsay" and are therefore admissible. § 27-801(4). As such, the focus of our inquiry is whether M.L.'s statement to the doctor relaying Crouse's command falls within the hearsay exception found at § 27-803(4).

Section 27-803(4) provides that the hearsay rule does not exclude "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." The exception is based on the notion that a person seeking medical attention will give a truthful account of the history and current status of his or her condition in order to ensure proper treatment. See *State v. Swartz*, 318 Neb. 553, 17 N.W.3d 174 (2025). In order for statements to be admissible under § 27-803(4), the party seeking to introduce the evidence must demonstrate (1) that the circumstances under which the statements were made were such that the declarant's purpose in making the statements was to assist in the provision of medical diagnosis or treatment and (2) that the statements were of a nature reasonably pertinent to medical diagnosis or treatment by a medical professional. *State v. Jedlicka*, 297 Neb. 276, 900 N.W.2d 454 (2017).

Crouse argues that there was insufficient "foundational facts presented at trial" to satisfy the requirements of § 27-803(4). Brief for appellant at 11. He particularly takes issue with the fact that M.L.'s statements were testified to by Deena rather than "the doctor who took the statements." *Id.*

However, there was sufficient foundational evidence establishing M.L.'s statements to the doctor were made for the purpose of medical diagnosis or treatment. Prior to recounting M.L.'s statements, Deena testified that she received a phone call from L.L. telling her to get to the hospital quickly. Upon her arrival, Deena proceeded to a "hospital room," comforted M.L. as she cried, and personally observed the doctor perform a medical evaluation of her daughter. The physician who conducted the medical examination had been M.L. and L.L.'s "doctor since they were real young." As part of the evaluation, the doctor elicited from M.L. a description of what had occurred. Under § 27-801(4), a declarant's state of mind may be reasonably inferred from the circumstances and determining whether the circumstances warrant inferring the appropriate state of mind is necessarily a fact-specific inquiry. See *State v. Jedlicka, supra*. Here, M.L.'s presence at the emergency room shortly after the sexual assault, coupled with Deena's testimony that she personally observed a medical evaluation conducted by M.L.'s longtime physician, warrants a

reasonable inference that M.L.'s statements were made for the purpose of medical diagnosis or treatment.

We also note that contrary to Crouse's argument, it was not necessary for the doctor to testify in this case. The focus of an analysis under § 27-801(4) is on the declarant's (i.e., M.L.'s) state of mind at the time the out-of-court statement was made, not that of the witness relating the declarant's statement at trial. Thus, any competent witness who heard M.L. give her statements to the doctor could testify to those statements at trial, so long as the proper foundation was laid pursuant to § 27-801(4).

Accordingly, we conclude that M.L.'s out-of-court statements to the doctor were made for the purpose of medical diagnosis or treatment, and the district court did not err in overruling Crouse's hearsay objection.

## (b) SANE Report

Crouse also objected to the introduction of the SANE report on hearsay grounds. The district court, without elaboration, overruled Crouse's objection and admitted the report as evidence. On appeal, Crouse essentially asserts that because the report document itself is hearsay and the content of the report contains hearsay statements by Deena, the report was inadmissible as double hearsay.

However, Crouse generally objected to the entirety of the SANE report at trial. As such, the State argues that if "any part of [the report] is properly admissible, then Crouse's hearsay objection to the entirety of the exhibit was properly overruled." Brief for appellee at 28. We agree. Even if we assume that some of Deena's statements contained in the report are inadmissible hearsay, it was not error to overrule an objection which is in part valid and in part invalid. See *State v. Merrill*, 252 Neb. 736, 566 N.W.2d 742 (1997). An objection to an exhibit as a whole is properly overruled where a part of the exhibit is admissible. *State v. Matteson*, 313 Neb. 435, 985 N.W.2d 1 (2023). Accordingly, if any portion of the SANE report is admissible, the district court committed no error in overruling Crouse's general hearsay objection.

In *State v. Swartz, supra*, the Nebraska Supreme Court concluded that material recorded by a nurse in a SANE report is admissible under the business records exception to the hearsay rule. Section 27-803(6)(a), defines a business record as:

> A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, other than opinions or diagnoses, made at or near the time of such acts, events, or conditions, in the course of a regularly conducted activity, if it was the regular course of such activity to make such memorandum, report, record, or data compilation at the time of such act, event, or condition, or within a reasonable time thereafter, as shown by the testimony of the custodian or other qualified witness . . . .

This exception is based on the premise that routine recordkeeping, essential to the conduct of business, produces the reliability necessary for admissibility of business records. See *State v. Swartz, supra*. The party seeking to admit a business record under this exception to the hearsay rule bears the burden of establishing foundation under a three-part test. *State v. Robinson*, 272 Neb. 582, 724 N.W.2d 35 (2006), *disapproved on other grounds*, *State v. Hagens*, 320 Neb. 65, 26 N.W.3d 174 (2025). First, the proponent must establish that the activity recorded is of a type that

regularly occurs in the course of the business' day-to-day activities. *Id.* Second, the proponent must establish that the record was made as part of a regular business practice at or near the time of the event recorded. *Id.* Third, the proponent must authenticate the record by a custodian or other qualified witness. *Id.*

Crouse concedes that the court in *Swartz* "held that a sexual assault nurse examination report is admissible as a business record," but he argues the State failed to lay the proper foundation. Brief for appellant at 12. We disagree. At trial, the State called a registered nurse who was also trained as a SANE. The nurse testified that she examined M.L. on December 3, 2023, and completed a "pediatric examination form." According to the nurse, this standardized form is used to assist examiners in documenting information obtained while performing their regular duties. The SANE report generated in this case included the nurse's own observations of M.L. physical condition, but it also contained other information provided by Deena.

It is clear from the nurse's foundational testimony that the SANE report contains factual statements, observations, and photographs routinely incorporated in SANE reports as they are regularly kept. The content recorded on the SANE report constitutes objective intake information. Since the SANE report document itself is admissible under the business records exception, see *State v. Swartz, supra*, we need not address whether the report contained other inadmissible hearsay statements from Deena. See *State v. Matteson*, *supra* (objection to whole exhibit properly overruled where part of exhibit is admissible).

Accordingly, the district court did not err in overruling Crouse's general hearsay objection to the SANE report, and the jury could properly consider the entire exhibit in rendering its verdict.

### 3. INEFFECTIVE ASSISTANCE OF COUNSEL

Crouse's remaining assignments of error concern his trial counsel's alleged ineffectiveness. As such, we recount the principles governing claims of ineffective assistance of counsel on direct appeal.

When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record; otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding. *State v. Clark*, 315 Neb. 736, 1 N.W.3d 487 (2024). However, the fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean it can be resolved. *Id.* The determining factor is whether the record is sufficient to adequately review the question under the standard of review previously noted. *Id.* The record is sufficient if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice as a matter of law, or that trial counsel's actions could not be justified as part of any plausible trial strategy. *Id.*

Generally, to prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Clark, supra*. To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *Id.* To show prejudice in a claim of ineffective assistance of counsel, the defendant must demonstrate a reasonable probability that but for

counsel's deficient performance, the result of the proceeding would have been different. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

A court may examine performance and prejudice in any order and need not examine both prongs if a defendant fails to demonstrate either. *Id.*

### (a) Failure to Object to Nurse's Testimony

In his brief, Crouse assigns as error trial counsel's failure to "properly object to the testimony from the Sexual Assault Nurse Examiner." Brief for appellant at 5. We agree with the State that this assignment of error is insufficiently stated.

Assignments of error on direct appeal regarding ineffective assistance of trial counsel must specifically allege the conduct that is claimed to constitute deficient performance. *State v. Kruger*, 320 Neb. 361, 27 N.W.3d 398 (2025). The Nebraska Supreme Court recently reiterated that an assignment of error is specific when it addresses a specific issue that does not require additional information to understand precisely what the assignment attacks. See *State v. Rupp*, 320 Neb. 502, 28 N.W.3d 74 (2025). An assignment of error alleging deficient performance by trial counsel must, standing alone, permit an appellate court to determine if the claim can be decided upon the trial record and also permit a district court to later recognize that the claim was raised on direct appeal. See *id.*

Crouse's assignment of error is insufficiently specific since it does not identify which portions of the nurse's testimony trial counsel should have objected to, nor does it specify the grounds for any objections. See *State v. Anders*, 311 Neb. 958, 977 N.W.2d 234 (2022) (refused to address assignment of error that counsel was ineffective for failing to object to inadmissible text messages since it did not specify in what manner text messages were inadmissible). We do acknowledge, however, that in the argument section of his brief, Crouse argues trial counsel should have made objections pursuant to Neb. Rev. Stat. §§ 27-602 and 27-701 (Reissue 2016) (lack of personal knowledge and improper opinion). While this does provide some specificity, it is well settled that an appellate court will not scour the remainder of an appellant's brief to extract specific allegations of trial counsel's deficient performance. See *State v. Mrza*, 302 Neb. 931, 926 N.W.2d 79 (2019), *disapproved on other grounds, State v. Hagens*, 320 Neb. 65, 26 N.W.3d 174 (2025).

Accordingly, Crouse's first claim of ineffective assistance of counsel is insufficiently stated, and we will not consider it.

### (b) Failure to Timely Communicate Plea Offer

Crouse next claims that trial counsel was ineffective for "[f]ailing to communicate a plea offer (or plea offers) to [him] with enough time to consider the offer." Brief for appellant at 5. Prior to opening statements on the first day of trial, the State made a formal plea offer on the record:

> [State's Counsel:] The State had made the offer of amending the Information to allege a Class II felony sexual assault in the first degree. So we would eliminate the child provisions of the statute which would be punishable by one to 50 years.
>
> There would not have been any kind of agreement with regard to sentencing.
>
> THE COURT: All right. Mr. Crouse, have you heard the plea agreement?
>
> [Crouse:] (Nods head.)

THE COURT: Excuse me?

[Crouse:] Yes, ma'am.

THE COURT: All right. And do you still wish to go forward with trial and reject the same?

[Crouse:] I do.

Despite his unequivocal rejection of the plea offer, Crouse nonetheless argues this decision was due to trial counsel's failure to explain the terms of the offer in a prompt and timely manner. According to Crouse, "trial counsel never visited him, never wrote him a letter, and only had one telephone call with him early in the" proceedings. Brief for appellant at 17. Trial counsel apparently communicated the State's plea offer to Crouse on the day of trial.

The plea-bargaining process presents a critical stage of a criminal prosecution to which the right to counsel applies. *State v. Alfredson*, 287 Neb. 477, 842 N.W.2d 815 (2014). As a general rule, defense counsel has the duty to communicate to the defendant all formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the defendant. *Id.* Trial counsel's failure to communicate a plea offer to a defendant is deficient performance as a matter of law. *State v. Iromuanya*, 282 Neb. 798, 806 N.W.2d 404 (2011). Here, Crouse does not dispute that the plea offer was communicated to him on the day of trial. However, he maintains that trial counsel's duty to communicate plea offers includes an obligation to relay offers with "reasonable time for the client to consider" them. Brief for appellant at 17. Crouse claims that if the plea offer was communicated to him earlier, he would have had more time to weigh the potential consequences of a trial, and he "likely would have accepted the plea." *Id.* at 18.

The Nebraska Supreme Court does not appear to have yet determined whether trial counsel's duty to communicate a plea offer requires such communication be done in a prompt manner, especially when the offer is ultimately divulged to the defendant and he or she rejects it in open court. However, the U.S. Supreme Court has used language suggesting that trial counsel must promptly communicate and explain to a defendant all plea offers made by a prosecuting attorney. See *Missouri v. Frye*, 566 U.S. 134, 132 S. Ct. 1399, 182 L. Ed. 2d 379 (2012). Further, a comment to the Nebraska Rules of Professional Conduct states that a lawyer who receives "a proffered plea bargain in a criminal case *must promptly* inform the client of its substance unless the client has previously indicated that the proposal will be acceptable or unacceptable or has authorized the lawyer to accept or to reject the offer." Neb. Ct. R. of Prof. Cond. § 3-501.4, comment 2 (emphasis supplied).

Regardless, we find it unnecessary to define the contours of trial counsel's duty to communicate a plea offer in the context of this direct appeal. Since the record does not show when trial counsel learned of the plea offer or contain any evidence relating to attorney-client communications, we are unable to resolve this claim of ineffective assistance of counsel on direct appeal. The issue is therefore preserved for postconviction review.

(c) Failure to Object to Hearsay Testimony

Crouse also claims that trial counsel was ineffective for failing to make hearsay objections to the following testimony at trial:

- L.L.'s testimony that she told the 911 operator that her "grandma's boyfriend had raped" M.L.
- L.L.'s testimony that she asked M.L. on the way to the emergency room if she felt "anything weird and slimy down in her private girl areas," and L.L.'s subsequent testimony that M.L. responded "yes."
- The emergency room nurse's testimony that L.L. told her that M.L. "had been raped."
- The emergency room nurse's testimony that M.L. "shook her head yes" when asked if Crouse "touched her down there."
- Deena's testimony that upon meeting M.L. at the emergency room, M.L. exclaimed, "Mommy, don't make me go back there."

Crouse contends that trial counsel's failure to object to the above statements was prejudicial because if the testimony had been excluded, there would have been insufficient evidence to support his conviction. Crouse argues that the testimony at issue was the "only evidence" introduced by the State to show he sexually penetrated M.L. Brief for appellant at 18. Sexual penetration is an essential element of first degree sexual assault of a child. See § 28-319.01. Sexual penetration is defined as "sexual intercourse in its ordinary meaning, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, of any part of the actor's or victim's body . . . into the genital or anal openings of the victim's body . . . ." Neb. Rev. Stat. § 28-318(6) (Cum. Supp. 2024). According to Crouse, "[w]ithout the inflammatory statements indicating that M.L. was 'raped,'" the only evidence offered by the State to prove sexual penetration was the DNA analyst's testimony and report showing Crouse's DNA was found on M.L.'s mons pubis. Brief for appellant at 18. Relying on *State v. Brown*, 225 Neb. 418, 405 N.W.2d 600 (1982), Crouse asserts oral contact with the mons pubis does not constitute sexual penetration within the meaning of § 28-318(6) because (1) contact of that nature is not an intrusion into the genital openings and (2) cunnilingus involves the stimulation of the "'vulva or clitoris,'" not the mons pubis. Brief for appellant at 18.

Crouse correctly notes that the Nebraska Supreme Court in *Brown* defined cunnilingus as "'stimulation of the vulva or clitoris with the lips or tongue.'" *Id.* at 428, 405 N.W.2d at 606 (quoting Webster's Third New International Dictionary, Unabridged 554 (1981)). The court explained that "once the perpetrator's lips or tongue touches any part of a female's genitalia, the act of cunnilingus is complete, irrespective of any actual penetration of the genitalia." *State v. Brown*, 225 Neb. at 429, 405 N.W.2d at 607. Despite Crouse's contention to the contrary, several medical authorities define the vulva to include the mons pubis. See *Bartman v. State*, 563 P.3d 121 (Alaska Ct. App. 2025) (collecting medical authorities). As the Alaska Court of Appeals recently explained:

[M]edical texts and dictionaries provide more detailed descriptions of the vulva, and the consensus among these authorities is that the mons pubis is part of the vulva. One text, for example, writes that the "female external genitalia" includes the following parts: "the mons pubis, labia majora et minora pudenda, the clitoris, vestibule, vestibular bulb and the greater vestibular glands."

*Id.* at 130 (quoting Gray's Anatomy 1446 (Peter L. Williams et al. eds., 37th ed. 1989)). We also note that the nurse who completed the SANE report in this case testified that the mons pubis is part of the female genitalia.

We find it unnecessary to decide whether the mons pubis is part of the vulva under Nebraska law, the stimulation of which would constitute cunnilingus under *State v. Brown, supra,* and therefore sexual penetration within the meaning of § 28-319.01. Even if we assume that trial counsel was deficient in not objecting to the challenged testimony, there is other, more probative, evidence in the record to show Crouse performed cunnilingus on M.L. As such, Crouse cannot demonstrate prejudice in the manner argued because there is no reasonable probability that but for counsel's deficient performance, the result of the trial would have been different.

The record is replete with evidence that Crouse's tongue and/or lips made contact with M.L.'s genitalia. Most notably, L.L. testified that she observed Crouse with his head between M.L.'s legs "licking her crotch area." The SANE report corroborated L.L.'s testimony, noting there was "[g]eneralized redness" on M.L.'s "labia major" and "hymen." According to the nurse who authored the SANE report, these areas are part of the female genitalia. When asked whether the redness she observed was consistent with a type of injury that may result from oral sex, the nurse responded that it "could be." All this evidence was introduced in conjunction with the DNA analyst's findings that Crouse's DNA was located on M.L.'s mons pubis.

Even without the alleged hearsay testimony, there was other probative evidence to support Crouse's conviction. As such, he cannot demonstrate prejudice in the way argued, and this claim of ineffective assistance of counsel fails.

### (d) Failure to File Motion to Suppress

Crouse next alleges that trial counsel was ineffective for "[f]ailing to file a motion to suppress to challenge the admissibility of [his] statements on the basis of a Fourth Amendment violation and a lack of voluntariness." Brief for appellant at 5. He argues that his post-*Miranda* statements to Officer Nelson were derivative of an illegal search of his home. Crouse alternatively claims that the statements were taken in violation of his right to due process because they were made involuntarily. He argues that "he was confused by the questions posed by the officers" and "didn't understand the questions or why he was in a room in a closed courthouse on a Sunday." Brief for appellant at 20. According to Crouse, "[h]ad the motion to suppress been filed, it would have been granted on either ground" and without these statements, "there is a likelihood [that] he would have been acquitted." *Id.*

However, even if we assume that trial counsel was deficient by not filing a motion to suppress on either ground, Crouse cannot demonstrate prejudice. At no point in his interview with police did Crouse ever admit to the sexual assault; he continuously denied the allegations. While we are cognizant that Officer Nelson testified that Crouse "changed his story" multiple times in the interview, as detailed previously, there was more probative evidence of Crouse's guilt. This evidence included L.L.'s personal observation of the sexual assault, the content of the SANE report, the DNA found on M.L.'s mons pubis, and M.L.'s own disclosures to emergency room staff that Crouse forcibly removed her pants and underwear. Accordingly, Crouse cannot demonstrate a reasonable probability that but for trial counsel's failure to file a motion to suppress, the outcome of trial would have been different.

- 15 -

### (e) Failure to Request Jury Instruction

Crouse also assigns that his trial counsel was ineffective for "[f]ailing to request a jury instruction on attempted sexual assault" because "the evidence regarding [sexual] penetration was circumstantial." Brief for appellant at 5. However, as the State points out, Crouse's brief does not provide an argument to support this alleged error. As such, we will not address this ineffective assistance of counsel claim. See *State v. Kruger*, 320 Neb. 361, 27 N.W.3d 398 (2025) (alleged error must be both specifically assigned and specifically argued in brief of party asserting error to be considered by appellate court).

### (f) Failure to Communicate

In his final assignment of error, Crouse alleges that his trial counsel was ineffective for failing to "consult with [him] about any trial issues, including whether [he] should testify at trial." Brief for appellant at 6. He expounds on this claim in the argument section of his brief by specifically stating "trial counsel did not have any substantial conversations with [him] about the evidence, the likelihood of a conviction, defense options, whether [he] should testify, the sentence to be imposed if convicted, or the plea offer." *Id.* at 20-21. The State contends that most of these claims of deficient performance were not sufficiently stated. We agree.

As mentioned previously, assignments of error on direct appeal regarding ineffective assistance of trial counsel must specifically allege the conduct that is claimed to constitute deficient performance. See *State v. Kruger, supra*. Crouse's charge that his trial counsel did not "consult with [him] about any trial issues" does not specifically allege deficient conduct; he does not identify what issues trial counsel purportedly failed to communicate about. Brief for appellant at 5. See *State v. Davis*, 31 Neb. App. 445, 456, 982 N.W.2d 261, 271 (2022) (refused to address assignment of error that counsel "did not effectively communicate with him").

However, we do note that Crouse's assignment of error does specifically allege that trial counsel did not discuss "whether [he] should testify at trial." Brief for appellant at 5. This is a sufficiently specific allegation of counsel's purported deficiency. As mentioned previously, the record before us does not contain any evidence related to attorney-client communications. Therefore, we cannot address Crouse's claim that trial counsel failed to discuss the propriety of testifying at trial in this direct appeal. Accordingly, this specific claim of ineffective assistance of counsel is preserved for postconviction review.

### (g) Cumulative Error

We note that in the argument section of his brief, Crouse argues that even if none of his allegations of trial counsel's deficient performance standing alone constitute reversible error, their cumulative effect nonetheless warrants reversal. However, Crouse did not assign the cumulative effect of trial counsel's deficient performance as error. Therefore, we will not address this argument. See *State v. Kruger, supra* (alleged error must be specifically assigned and specifically argued in brief of party asserting error to be considered by appellate court).

## VI. CONCLUSION

We conclude that the district court was not constitutionally required to hold a hearing to determine the voluntariness of Crouse's statements when no pretrial motion was filed or objection

at trial was made. We also find that Crouse's hearsay objections during trial were properly overruled. Finally, Crouse's claims of ineffective assistance of trial counsel are either not sufficiently stated, fail as a matter of law, or are unable to be decided on direct appeal. We therefore affirm Crouse's conviction for first degree sexual assault of a child.

AFFIRMED.